Argued and submitted December 13, 1999, affirmed May 8, petition for review denied August 13, 2002 (334 Or 492)

# ROGERS MACHINERY, INC.,
## *Appellant,*

*v.*

# WASHINGTON COUNTY
## and City of Tigard,
### *Respondents.*

## C971202CV; A104615

45 P3d 966

David J. Hunnicutt argued the cause and filed the briefs for appellant.

Loretta S. Skurdahl argued the cause and filed the brief for respondent Washington County.

G. Frank Hammond argued the cause for respondent City of Tigard. With him on the brief were Timothy V. Ramis and Ramis Crew Corrigan & Bachrach, LLP.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LINDER, J.

**LINDER, J.**

Pursuant to ORS 34.010 *et seq.*, Rogers Machinery, Inc., petitioned for a writ of review to challenge the imposition of a Traffic Impact Fee (TIF) assessed under a Washington County ordinance. Respondents are Washington County and the City of Tigard, which jointly administer the ordinance.[1] The TIF is assessed against property developers to provide funds for improvements to city streets and arterials. Petitioner challenges the TIF assessed against it as a taking of its property without just compensation, in violation of the Fifth Amendment to the United States Constitution.[2] Petitioner also argues that the TIF ordinance violates state statutes governing system development charges (SDCs). We review to determine whether, in upholding the assessment, the trial court misconstrued the applicable law. ORS 34.040(1)(d), (e); *Johnson v. Civil Service Board*, 161 Or App 489, 498, 985 P2d 854, *on recons* 162 Or App 527, 986 P2d 666 (1999). We affirm.

The facts relevant to our review are not disputed. Petitioner operates a business that has its headquarters in the City of Tigard. Because of crowding in the existing headquarters building, petitioner decided to construct a second building on the same site. Petitioner planned to relocate approximately 40 employees from the existing building to the new one. In February 1997, petitioner applied for a building permit for the new building. After reviewing the permit application and other materials relating to the proposed development, the city determined that, under the TIF ordinance, petitioner's proposed development fit the use category

---

[1] The ordinance establishing the TIF was approved by Washington County voters in November 1990. In 1994, Washington County and the City of Tigard entered into an intergovernmental agreement, pursuant to which the city administers the TIF as to property within the city limits. Relevant portions of the TIF are set out in the discussion below.

[2] The Takings Clause of the Fifth Amendment to the United States Constitution provides, in part:

"[N]or shall private property be taken for public use, without just compensation."

Petitioner does not raise a challenge under the parallel provisions of Article I, section 18, of the Oregon Constitution.

of "general light industrial." Applying the formula applicable to that category, the city assessed a TIF of $37,102.[3]

Petitioner filed an administrative appeal of the assessment, raising its statutory and constitutional challenges to the TIF. *See* Washington County Code (WCC) § 3.17.110 (providing for appeals seeking refunds of monies collected under the TIF). After a hearing, a county hearing officer issued an order upholding the assessment generally but directing it to be recalculated based on the hearing officer's conclusion that the proposed development fit into three relevant use categories. The city recalculated the assessment, apportioning it according to the uses identified by the hearing officer and applying current rates; the recalculated assessment was $37,018.

After paying the assessment, petitioner brought this writ of review proceeding in circuit court, asserting that the TIF violates the federal Takings Clause. In particular, petitioner argued that the TIF is invalid under the individualized "rough proportionality" test announced in *Dolan v. City of Tigard*, 512 US 374, 114 S Ct 2309, 129 L Ed 2d 304 (1994). Petitioner also challenged the TIF as inconsistent with certain provisions of ORS chapter 223 relating to systems development charges.

In response to petitioner's federal constitutional challenge, respondents argued that the Takings Clause and *Dolan*'s rough proportionality test do not apply to the TIF, for three reasons: (1) the TIF is a tax, not an exaction; (2) the TIF is not the result of an ad hoc adjudicative decision; and (3) the TIF, even if it is an exaction, does not require the dedication of property. Respondents argued alternatively that, even if the test announced in *Dolan* applies to the TIF, the ordinance satisfies that test. In response to petitioner's claim that the TIF violates portions of ORS chapter 223, respondents argued that ORS chapter 223 does not apply to the TIF because it is a tax and not a systems development charge. Respondents asserted further that, if ORS chapter 223 does apply, petitioner's challenge to the TIF as inconsistent with

_____

[3] The manner in which the calculation is made pursuant to the ordinance is described below.

that statutory scheme is both untimely and without merit. The circuit court rejected petitioner's challenge to the TIF, reasoning that the TIF is a tax and that *Dolan* therefore does not apply to it. The circuit court further concluded that the TIF is "compatible" with the provisions of ORS chapter 223 relating to systems development charges.

On appeal, the parties renew the arguments they made below.[4] We begin by describing the provisions of the ordinance and the assessment that it authorizes. We then consider petitioner's claim that the TIF is invalid under the statutes relating to system development charges. *See State v. Kennedy*, 295 Or 260, 262-65, 666 P2d 1316 (1983) (statutory issues should be resolved before reaching constitutional issues). Because we reject that challenge, we finally consider petitioner's claim that the TIF violates the federal Takings Clause.

## I. THE ORDINANCE IMPOSING THE TIF

Washington County first adopted the ordinance authorizing the TIF in 1985. In 1990, the ordinance was amended to apply to cities and was readopted as amended. The ordinance is codified in the Washington County Code as chapter 3.17 and, at the outset, identifies its purpose and scope as follows:

"A. This tax is adopted to ensure that new development contributes to extra capacity transportation improvements needed to accommodate additional traffic generated by such development.

"B. This tax shall provide funds for extra capacity improvements to county and city arterials and certain collectors or state facilities. It applies throughout the county, including within incorporated cities."

WCC § 3.17.020.

---

[4] By amendment at trial of its petition for writ of review, petitioner also sought restitution in the amount of the difference between the assessment imposed after its appeal, based on the new rate, and the assessment that would have been imposed using the rates in effect before its appeal. The circuit court rejected petitioner's argument in that regard, and petitioner assigns error to that ruling. We conclude that the circuit court did not err and that the issue does not merit further discussion. We therefore confine our decision to petitioner's statutory and constitutional challenges to imposition of the TIF.

Section 3.17.050 describes the method for determining the amount of the assessment to be imposed. In effect, under that section and Appendix A of the ordinance, the assessment depends on the type of use proposed for the new development. As pertinent here, the ordinance specifically provides:

"A.   The amount of the tax due shall be determined by multiplying the following applicable dollar amount, adjusted as provided in subsection E of this section, by the number of average weekday trips generated by the new development in accordance with the basis for trip determination set forth in Appendix A attached hereto and incorporated herein.

"\* \* \* \* \*

"Office use                         $124 per average weekday trip

"Industrial use                    $130 per average weekday trip

"\* \* \* \* \*

"B.   In the event an identified use does not have a basis for trip determination stated in Appendix A, i.e., not available, the director[5] shall either:

"1.   Determine the trip generation based on the use listed in Appendix A most similar in traffic generation; or

"2.   At the election (and expense) of the applicant, consider actual trip generation of a same or similar use verified by a registered traffic engineer. In the event actual trip generation is utilized, the director may make such adjustments as he deems applicable in consideration of location, size and other appropriate factors in determining the average weekday trip.

"C.   It is recognized that single structures may include more than one use. In such event the director for purposes of establishing the traffic impact fee shall proportion the uses accordingly.

"D.   The applicant shall, at the time of application for a building permit, provide the department with necessary and applicable information, such as the type of use, number

---

[5] The "director" is the director of the county department of land use and transportation or, in those cities that collect and administer the tax themselves, the person charged with those duties. WCC § 3.17.020(O).

of employees or square footage of structures, necessary to calculate the traffic impact fee."

Appendix A further sets out various specific land use categories (which are listed under the general categories of "residential," "institutional," "business and commercial," "office," and "industrial,"), the bases for "trip determination" for those categories (*e.g.*, square footage, number of employees, or similar criteria), and the weekday and weekend average trip rates that apply to the various uses.[6] Using those calculations, the amount of the fee is then determined by applying a "weighted average daily" trip rate formula for the use. WCC § 3.17.050(A).

Under subsection E of section 3.17.050, the dollar amounts specified in subsection A are subject to yearly increases of six percent or, if determined to be a "more accurate estimate of the increase or decrease in construction costs," they can be increased or decreased based on a "construction cost index" prepared and maintained by the county. In all events, any increase in the dollar amounts may not exceed six percent.

The tax is "due and payable at the time of issuance of a building permit[.]" WCC § 3.17.060(A). If the amount due for any one building exceeds $5,000, an applicant may request a "payment deferral," in which event payment is due when the occupancy permit issues. WCC § 3.17.060(B). Applicants may finance their TIF obligations with "Bancroft Bonding" under ORS 223.205 to ORS 223.295. *See* WCC § 3.17.060(C). The ordinance also provides for certain credits and offsets against the TIF obligation. For example, an applicant is entitled to a credit for constructing certain "eligible capital improvements," such as "extra capacity road or transit" improvements and improvements constructed "to address a safety hazard." WCC § 3.17.070(A) and (B). If a developer files a written request for an offset within a specified time period after the assessing authority's acceptance of the traffic safety improvement, the developer is reimbursed

---

[6] The record shows that the City of Tigard used the *Institute of Traffic Engineers (ITE) Trip Generation Manual, 4th Edition,* in determining the land use categories applicable to particular developments. The record, however, does not include a copy of the manual.

for the cost of the improvement from TIF funds collected directly from that developer. WCC § 3.17.080. Developers may also apply for refunds of TIF payments. Refunds are granted upon a finding by the director of a clerical error in their calculation or, if the refund is timely requested, for failure to claim a credit or offset. WCC § 3.17.110.

Revenues generated by the TIF are deposited into dedicated funds. Under section 3.17.090(A), the funds "shall be used for no purpose other than those activities described as, or for the benefit of, extra capacity facilities as defined herein." Pursuant to section 3.17.100, authorized expenditures include those for new or expanded arterial and collector road projects, extra capacity transit projects, and the costs of administering the TIF assessments and the projects they fund. The county is required to review the TIF annually to ensure that revenues neither exceed nor fall short of amounts needed for identified extra capacity demands. WCC § 3.17.140.

An appeal is available to "any citizen or other interested person" to challenge an expenditure of TIF revenues. WCC § 3.17.150(A)(1). Also, any person "aggrieved by a discretionary decision of the director may appeal the decision to the county hearings officer." WCC § 3.17.150(B)(2). The decision of the county hearings officer is reviewable solely under ORS 34.010 through ORS 34.100 (writ of review) in circuit court. WCC § 3.17.150(B)(5).

## II.   PETITIONER'S STATUTORY CHALLENGE

As earlier noted, we begin with petitioner's statutory challenge to the TIF. Petitioner argues that the TIF is a "system development charge" and therefore must comply with the provisions of ORS chapter 223 governing such charges.[7] Specifically, petitioner contends that the TIF is an "improvement fee" as defined in ORS 223.299(2), which is one of two types of fees that qualify as a SDC. Petitioner asserts that the

---

[7] The statutes have been amended since this case arose in ways not pertinent to this case. *See* Or Laws 2001, ch 662, §§ 2-6 and Or Laws 1999, ch 1098, § 2. We cite the preamendment versions of the relevant statutory provisions.

ordinance establishing the TIF fails to comply with the calculation methodology required by ORS 223.304(2) and that the TIF therefore is invalid.

Respondents answer with three arguments. First, both respondents assert that the TIF is a tax, not a fee or an assessment, and that it therefore is not subject to the statutes governing SDCs. The county argues alternatively that, even if the TIF is subject to those statutes, petitioner's challenge is time-barred. Finally, the city argues that, in all events, the TIF complies with the methodology required by ORS 223.304(2) and that petitioner's challenge therefore fails on the merits.

The threshold issue is whether the TIF is subject to the statutes governing SDCs. *See* ORS 223.297 to ORS 223.314. The express purpose of that statutory scheme is "to provide a uniform framework for the imposition of system development charges by governmental units for specified purposes and to establish that the charges may be used only for capital improvements." ORS 223.297. SDCs are defined as: "[A] reimbursement fee, an improvement fee or a combination thereof assessed or collected at the time of increased usage of a capital improvement or issuance of a building permit or connection to the capital improvement." ORS 223.299(4)(a). A reimbursement fee is a fee for "costs associated with capital improvements already constructed or under construction." ORS 223.299(3). An improvement fee is a fee for "costs associated with capital improvements to be constructed." ORS 223.299(2). "Capital improvements" refers to facilities or assets used for specified purposes, such as water supplies, waste water collection, and transportation. *See* ORS 223.299(1). Finally, in addition to describing what is included in the term "system development charge," the statutory scheme also specifies what is not included. For example, fees assessed or collected by local improvement districts are expressly excluded, as are the costs of complying with requirements or conditions of land use decisions. ORS 223.299(4)(b).

■ In light of the plain language of those definitions, we agree with petitioner that the TIF at issue in this case qualifies as an "improvement fee." It is a charge for costs associated with a future capital improvement (*i.e.*, transportation

infrastructure). The charge, moreover, is assessed or collected when a development permit issues (subject to provisions to defer payment). The TIF, quite simply, squarely fits what the statutes describe.

In arguing to the contrary, respondents focus on the fact that the ordinance, although it terms the collection a "traffic impact fee," otherwise refers to it as a tax. *See, e.g.*, WCC § 3.17.010 (entitling the chapter the "Washington County traffic impact fee ordinance"); WCC § 3.17.030 (defining "fee" to mean "the traffic impact tax adopted herein"). But nothing in the statutory scheme suggests that the label given to a particular charge is significant in determining whether it qualifies as a SDC. Rather, the statutes describe the charges they govern in substantive terms—that is, by the types of capital improvements, past or future, that the charges fund (*e.g.*, transportation improvements), and by the process by which the assessment is made (*e.g.*, in connection with issuance of a development permit). The legislature deemed it appropriate to exempt some charges, such as costs for compliance with land use conditions, that might otherwise fit the statute's definitions. The legislature, however, provided no such exemption for local "taxes" assessed against new development to fund the cost of capital improvements necessitated by such development. To the contrary, the legislature expressly declared its goal of establishing a "uniform framework" for imposition of systems development charges, a goal that would be undermined if labels, rather than substance, determined the statutory scheme's reach. We therefore conclude that the statutes pertaining to SDCs apply to the TIF.

The next question is whether, as the respondent county argues, petitioner's claim that the TIF is invalid under the statutes is time barred. In that regard, petitioner's only argument under the statutory scheme is that the TIF does not comply with ORS 223.304(2), which provides, in part:

> "Improvement fees shall be established by ordinance or resolution setting forth a methodology that considers the cost of projected capital improvements needed to increase the capacity of the systems to which the fee is related."

Petitioner's position is that, to comply with the methodology required by that provision, the funds collected from a particular developer must be used to address the specific impacts of the proposed development, rather than to finance jurisdiction-wide improvements to increase the capacity of the affected systems more generally. According to petitioner, the funds collected through the TIF do the latter, not the former, and the TIF therefore is invalid.

**2.** We agree with the respondent county that petitioner's challenge in that regard is untimely. ORS 223.304(5) provides:

> "No legal action intended to contest the methodology used for calculating a system development charge shall be filed after 60 days following adoption or modification of the system development charge ordinance or resolution by the local government."

Petitioner does not suggest that its challenge is something other than one to the methodology used for calculating the TIF or that the 60-day time limitation does not by its terms apply. Instead, petitioner argues only that the limitation should not be enforced in this instance because, until petitioner sought a development permit, it had no incentive to bring its challenge. But the statute contains no exceptions. Nor does petitioner challenge the validity of the statute imposing a time limitation on such challenges. Petitioner appears merely to invite us to decline to apply the statute to it on policy grounds. We have no authority to do so. Consequently, the circuit court correctly rejected petitioner's statutory challenge.

### III. PETITIONER'S TAKINGS CLAIM

We next consider petitioner's argument that the TIF is an uncompensated taking of its property, in violation of the federal constitution's Takings Clause. In resolving that claim, we begin by addressing respondents' preliminary assertion that the TIF is not subject to a Takings Clause analysis because it is a tax.

■ Respondents are correct that, generally, the Takings Clause does not apply to taxes. *See Penn Central Transp. Co. v. New York City*, 438 US 104, 124, 98 S Ct 2646, 57 L Ed 2d

631 (1978) (the taxing power is "one obvious example" of an exercise of government power that affects property or economic interests without giving rise to takings claims); *see also Individuals for Responsible Government, Inc. v. Washoe County*, 110 F3d 699, 704 (9th Cir 1997), *cert den* 522 US 966 (1997) (holding that a recycling service charge was analogous to a property tax and therefore not subject to challenge as a taking of property). In contrast, special assessments or user fees for services, such as improvements to community infrastructures, have "traditionally been 'deemed to be part of the police power and not of the power of taxation.'" *Scappoose Sand and Gravel, Inc. v. Columbia County*, 161 Or App 325, 333, 984 P2d 876, *rev den* 329 Or 528 (1999) (citing *Sproul v. State Tax Com.*, 234 Or 579, 591, 383 P2d 754 (1963)). Thus, user fees, assessments, and similar collections at least potentially are subject to takings analysis. *See, e.g., United States v. Sperry*, 493 US 52, 60, 110 S Ct 387, 107 L Ed 2d 290 (1989) (takings analysis applied to fees used to defray the federal government's expenses in providing a claims tribunal).

We decline to resolve petitioner's constitutional challenge on the basis that the TIF qualifies as a tax, however, for two reasons. First, the TIF has characteristics of both a tax and a special assessment or similar fee and therefore defies ready classification as either. Traditionally, taxes and assessments have been distinguished as follows:

> "In the most general sense, a tax is 'any contribution imposed by government upon individuals, for the use and service of the state, whether under the name of toll, tribute, tallage, gabel, impost, duty, custom, excise, subsidy, aid, supply, or other name.' Black's Law Dictionary 1457 (6th ed 1991). An assessment is a government fee imposed on owners of property to finance improvements or services directly benefitting that property; an assessment is exempt from constitutional limitations requiring that taxes be uniformly imposed so long as the financial burden and the private benefit are closely related. *King v. Portland*, 38 Or 402, 63 P 2 (1900), *aff'd* 814 US 61, 22 S Ct 290, 46 L Ed 431 (1902)."

*Automobile Club v. State of Oregon*, 314 Or 479, 485-86, 840 P2d 674 (1992) (footnote omitted). The TIF at issue in this case is fee-like in that it is collected only from persons whose activities give rise to a need for government to exercise its

power to build, expand, or improve the transportation facilities of the community. *See generally Sproul,* 234 Or at 592-93 (when the cost of a governmental expense is to be paid only by persons causing government to incur the expense, limitations on governmental taxing authority do not apply). On the other hand, the TIF is spent in ways that make it more like a tax. That is, the collections are pooled into a fund that is used to serve the general public by improving the capacity of city streets and arterials within the jurisdiction generally. The funds are not spent only or necessarily on improvements that are directly tied to the developed property, such as, for example, improving the access from the development to the adjacent street. The TIF thus has a hybrid quality.

Second, any resolution based on the parties' tax-versus-fee debate would not be responsive to petitioner's argument, which is that the characterization does not matter. What matters, according to petitioner, is that the government took petitioner's property (here, money) as a condition for developing petitioner's land. Petitioner views *Dolan* as subjecting any such monetary exaction, whether considered a tax or a fee, to an individualized "rough proportionality" analysis under the federal Takings Clause. Consequently, even were we to characterize the TIF as a tax, that characterization would not meet petitioner's challenge. We must, in all events, examine the Supreme Court's Takings Clause jurisprudence and the extent to which the holding in *Dolan* applies to the assessment at issue in this case. We therefore turn to that examination.

A. *Federal Takings Clause Jurisprudence*

At the outset, it is helpful to clarify the nature of the collection that petitioner seeks to invalidate in this case. The challenged TIF, whether deemed a tax or a form of assessment, unquestionably is what in land use parlance is termed an "impact" or "development" fee. Local governments and municipalities often impose such charges on developers as a condition of zoning changes, building and development permits, or other governmental approvals necessary for new and, generally, more intensified development to occur. As described in one academic treatment of the subject:

"Exactions can take various forms, including in-kind dedications for infrastructure, such as roads, parks, and schools, and 'in lieu' fees for the same purpose. Exactions also include impact fees, or special assessments, to cover the cost of development. The main goal of the imposition of exactions is 'to shift to the developer the costs of the public infrastructure that the development requires.' Essentially, exactions force developers to internalize the 'external cost' they impose on the surrounding community."

Abraham Bell and Gideon Parchomovsky, *Givings*, 111 Yale LJ 547, 609 (2001) (footnotes omitted). The TIF's character as an exaction is what gives rise to the particular legal dispute in this case.

■ Exactions do not fit neatly within the more conventional Takings Clause analytical construct. Traditionally, takings jurisprudence has distinguished between two kinds of encroachments on property interests, with significantly different analyses applicable to each. The first is an actual physical invasion or occupation of property, whether in the form of a physical trespass or a forced dedication, as a result of which some portion of the property may be used by others. The Fifth Amendment is particularly protective of property against that form of encroachment, and physical invasions or diminutions of rights of exclusive possession have been deemed to be *per se* takings that entitle a property owner to compensation. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 102 S Ct 3164, 73 L Ed 2d 868 (1982). Such an invasion is unconstitutional "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 434-35.

■■ The same is not true, however, of the second traditionally recognized type of government encroachment on property interests, namely, regulatory restrictions on property uses (*e.g.*, zoning). In testing use restrictions, no "set formula" determines whether an unconstitutional taking has occurred. *Lucas v. South Carolina Coastal Council*, 505 US 1003, 1015, 112 S Ct 2886, 120 L Ed 2d 798 (1992). Instead, a court must engage in an essentially ad hoc, factual inquiry that considers whether the land use regulation "substantially advance[s] legitimate state interests" and "does not

den[y] an owner economically viable use of his land." *Agins v. Tiburon,* 447 US 255, 260, 100 S Ct 2138, 65 L Ed 2d 106 (1980); *see also Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 US 687, 704, 119 S Ct 1624, 143 L Ed 2d 882 (1999) (land use regulations are tested under the Takings Clause to determine whether they are reasonably related to legitimate public interests). Thus, when the government regulates property without physically occupying it, the Takings Clause is much less protective of the interests of the property owner and much more deferential to the public interests served.

*Dolan,* and the case that foreshadowed it, *Nollan v. California Coastal Comm'n,* 483 US 825, 107 S Ct 3141, 97 L Ed 2d 677 (1987), were decided against that landscape. Both cases involved development conditions that, in effect, required the landowner to forfeit part of his or her property in exchange for approval to develop. The Court therefore was confronted with a blend of the governmental encroachments described above. On the one hand, the challenged government action involved a regulatory use restriction in the form of a restriction on further development. Traditionally, such a restriction would have triggered a lenient takings standard. On the other hand, as a condition of relaxing the use restriction, the government required the property owner to suffer a physical occupation or invasion. Traditionally, such an invasion would have been considered a *per se* taking. The issue for the Court was how to test that amalgamation.

The facts of the cases provide context that is helpful to understanding the Court's resolution of that issue. In *Nollan,* the plaintiffs sought approval from a California agency to rebuild a beachfront house. The agency granted the approval, subject to the condition that the plaintiffs dedicate a public easement behind their house, along the shore, so that the public could pass freely between the two public beaches bordering the plaintiffs' property. In invalidating the dedication, the Court accepted as legitimate the agency's concern that the house that the plaintiffs proposed to build would block visual access to the beach and create a "psychological barrier" to its use by the public. But the Court considered the requirement of a public easement behind the house to be unrelated to that interest, because it did nothing to

enhance visual access of the beach from the street or to overcome any psychological barrier. Instead, the easement merely facilitated use of the public beaches by people already aware of and using them. The Court concluded that the dedication therefore lacked an "essential nexus" between the condition imposed and the government interest in imposing it, which rendered the dedication a taking. *Id.* at 841-42. In short, although the Court declined to deem the condition a *per se* taking as it had for other physical invasions or dedications of property interests, the Court required that there be a logical connection between the governmental interest to be served and the particular condition imposed on the landowner.

There was, however, a second shoe to drop, and the Court signaled as much in *Nollan.* In *Nollan,* because the Court determined that no connection existed between the dedication and the government's interest in imposing it, the Court did not have to decide how close a nexus is required between the two to avoid an unconstitutional taking; it therefore identified the issue but declined to resolve it. *Id.* at 838. Several years later, the Court granted *certiorari* in *Dolan* for the express purpose of settling that unresolved issue. 512 US at 377.

In *Dolan,* the property owner sought to double the size of her retail store and to pave her parking lot. As a condition of allowing the development, the city required the owner to dedicate a 15-foot strip of land for use as a pedestrian path and bikeway and also to dedicate a portion of her property within the 100-year flood plain for a publicly accessible "greenway." The city defended the bikeway requirement with a calculation that the increased size of the retail store would add 937 car trips per week and that the bikeway "could" help to offset the increased traffic. The city defended the flood plain dedication on the basis that paving the gravel parking lot would increase the amount of impermeable ground, thus adding to flooding from the adjacent and already overburdened creek. *Id.* at 379-82.

The Court, in examining the dedications, established a two-step inquiry for analyzing regulatory takings

claims in the context of conditional use or development permits. First, as it had in *Nollan*, the Court examined whether there was an "essential nexus" between the conditions and legitimate governmental interests, such that the purpose to be served by the condition was the same as the government's interest in the use restriction. The Court found that nexus requirement readily satisfied. More specifically, the Court determined that there was a logical relationship between relieving traffic congestion and requiring a bike path and between the increased risk of flooding due to the parking lot and requiring property within the local flood plain to remain undeveloped. 512 US at 387-88.

Second, having determined that the "essential nexus" inquiry was satisfied, the Court turned to the degree of connection between the dedications and the projected impact of the proposed development. *Id.* at 388. The Court began by endorsing the predominant test developed by state courts—*i.e.*, the requirement of a "reasonable relationship" between the condition imposed and the impacts of the development. That test, the Court reasoned, best "encapsulat[ed]" what the federal Takings Clause requires. *Id.* at 391. The Court, however, adopted the phraseology "rough proportionality" to avoid confusion with "rational basis" scrutiny, which the Court viewed as appropriate for equal protection rather than takings analysis. *Id.* Thus, the Court held that there must be "rough proportionality" between a development's projected impacts and the exactions required of the property owner as a condition of development. *Id.* The Court emphasized that it was requiring proportionality of only an approximate kind: "No precise mathematical calculation is required, but the city must make some effort to quantify its finding in support of the dedication * * * beyond the conclusory statement that it could offset some of the [impacts of the development]." *Id.* at 395-96. But the government "must make some sort of *individualized determination* that the required dedication is related both in *nature and extent* to the impact of the proposed development." *Id.* at 391 (emphasis added). Moreover, the Court made clear that it was departing from the general rule applicable to zoning and other use restrictions that the "burden properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation

of property rights." *Id.* at 391 n 8. Instead, the burden was on the government "to justify the required dedication." *Id.*

Applying the "rough proportionality" prong of the test to the case before it, the Court concluded that the record in *Dolan* was insufficient to satisfy the government's burden. With respect to the dedication of the greenway, the Court observed that the city's interest in not overburdening the adjacent creek was served by keeping the flood plain free of development. But rather than just regulate petitioner's private use of that portion of the property, the city required her to dedicate it to public use as a greenway. The Court concluded that nothing in the record demonstrated any "individualized determination" of the development impacts that would support divesting the owner of her property, rather than regulating her use of it. *Id.* at 393-94. As for the bike and pedestrian pathway, the Court deemed the city's finding that the pathway *could* offset some of the traffic demand insufficiently precise to justify a dedication of some the landowner's property for public use. *Id.* at 395-96.

As we have observed in *Dolan*'s aftermath, the new obstacle posed to development conditions by *Dolan*'s "rough proportionality" test is not in the standard itself—which the Court viewed as similar to the familiar "reasonable relationship" test. Rather, that obstacle arises from the specificity required in analyzing the impacts of a particular proposed development and comparing them to the nature and extent of the exactions required as a condition of approving the development. *See Art Piculell Group v. Clackamas County*, 142 Or App 327, 340, 922 P2d 1227 (1996); *J.C. Reeves Corp. v. Clackamas County*, 131 Or App 615, 620, 887 P2d 360 (1994). *Dolan*'s test also is more rigorous for the government because it places the burden on the government in the first instance to justify the condition as sufficiently proportionate, rather than giving the property owner the initial burden to demonstrate the lack of the necessary relationship between the impacts of the development and the condition imposed. *See Schultz v. City of Grants Pass*, 131 Or App 220, 225, 884 P2d 569 (1994) (discussing the shift of burden under *Dolan*). In departing from the less exacting requirements applicable to zoning and other traditional use regulations, the Court in *Dolan* explained:

"Th[ose sort of land use regulations], however, differ in two relevant particulars from the present case. First, they involved essentially legislative determinations classifying entire areas of the city, whereas here the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. Second, the conditions imposed were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city."

512 US at 385. The Court defended placing the burden of justification on the government for related reasons:

"Justice Stevens' dissent takes us to task for placing the burden on the city to justify the required dedication. He is correct in arguing that in evaluating most generally applicable zoning regulations, the burden properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights. Here, by contrast, the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. In this situation, the burden properly rests on the city."

*Id.* at 391 n 8 (citations omitted).

B.  *Dolan's Application to Legislatively Imposed and Generally Applicable Development Fees—The National Landscape*

We have examined *Nollan* and *Dolan* in other cases that have come before us since the Court issued those decisions.[8] We have done so again in this case to highlight aspects of the decisions that have particular bearing on the issue before us. Both *Nollan* and *Dolan* arose in the context of discretionary adjudicative determinations specific to one development proposal on a particular parcel of land. Both, moreover, involved conditions that took the form of a dedication of property for public use. As the decision in each case reveals, those facts played an explicit part in the Court's rationale for adopting a heightened level of scrutiny for the development conditions at issue. But whether those facts are therefore an indispensable predicate for applying that scrutiny has been, and remains, unclear. The two questions that consequently

---

[8] *See, e.g.,* 181 Or App at 392-95 (citing cases).

have generated considerable litigation for lower courts are: (1) Does heightened scrutiny apply to nonpossessory exactions, such as development or impact fees like the TIF imposed in this case? (2) Does that scrutiny apply to exactions imposed through generally applicable legislation rather than individual adjudicative decisions?

In the eight years since *Dolan* was decided, no consensus has emerged among lower courts on those questions and, so far, the Supreme Court has declined to grant certiorari in cases that might have provided further guidance. *See, e.g., Parking Association of Georgia v. City of Atlanta*, 264 Ga 764, 450 SE2d 200 (1994), *cert den* 515 US 1116 (1995) (*Dolan* does not apply to a development condition imposed through a legislative process rather than through individualized determinations); *Amoco Oil Co. v. Village of Schaumburg*, 277 Ill App 3d 926, 661 NE2d 380 (1995), *cert den* 519 US 976 (1996) (*Dolan* applies to legislatively imposed property development conditions). Lower court authority appears most sharply divided on the issue of *Dolan*'s application to monetary exactions. Some courts have declared, seemingly categorically, that *Dolan* is limited to dedications of property and does not extend to nonpossessory exactions, such as the payment of fees.[9] Other courts have rejected that view, holding that *Dolan* potentially can extend to monetary exactions, at least in some circumstances.[10] A similar split of authority exists in lower courts as to whether *Dolan* is limited to development conditions imposed through

---

[9] *E.g., Clajon Prod. Corp. v. Petera*, 70 F3d 1566, 1578 (10th Cir 1995) (declining to apply *Dolan* to fees imposed on landowners as a condition of exercising their property right to hunt on their own land because no physical occupation is involved); *Commercial Builders of Northern California v. City of Sacramento*, 941 F2d 872, 875-76 (9th Cir 1991), *cert den* 504 US 931 (1992) (declining to extend holding in *Nollan* to purely monetary exaction); *McCarthy v. Leewood*, 257 Kan 566, 894 P2d 836 (1995) (concluding that nothing in *Dolan* supports making the critical leap from property dedications to impact fees).

[10] *E.g., Home Builders Association of Central Arizona v. City of Scottsdale*, 187 Ariz 479, 930 P2d 993, *cert den* 521 US 1120 (1997); *Erhlich v. City of Culver City*, 12 Cal 4th 854, 50 Cal Rptr 2d 242, 911 P2d 429, *cert den* 519 US 929 (1996); *Krupp v. Breckenridge Sanitation Dist.*, 19 P3d 687 (Colo 2001); *Town of Flower Mound v. Stafford Estates Ltd. Partnership*, 71 SW3d 18 (Tex App 2002); *Benchmark Land Co. v. City of Battle Ground*, 103 Wash App 721, 14 P3d 172 (2000), *rev allowed* 143 Wash 2d 1018 (2001).

adjudicatory decisions or whether it extends to those imposed as a result of generally applicable legislation.[11]

The legislative-versus-adjudicative imposition of a development condition has proved especially significant for courts that have extended *Dolan*'s heightened scrutiny test to monetary exactions. With near uniformity, lower courts applying *Dolan* to monetary exactions have done so *only* when the exaction has been imposed through an adjudicatory process; they have expressly declined to use *Dolan*'s heightened scrutiny in testing development or impact fees imposed on broad classes of property pursuant to legislatively adopted fee schemes. The California Supreme Court's decision in *Erhlich v. City of Culver City*, 12 Cal 4th 854, 50 Cal Rptr 2d 242, 911 P2d 429, *cert den* 519 US 929 (1996), together with its more recent decision in *San Remo Hotel v. City and County of San Francisco*, 27 Cal 4th 643, 117 Cal Rptr 2d 269, 41 P3d 87 (2002), provides one of the more in-depth and thoughtful discussions of the reason for that distinction.

*Erhlich* involved a development permit for a condominium complex to be built on the site of a former private tennis club. As a condition for the permit, the city required the owner to pay a $280,000 fee to be used for city development of recreational facilities. Although the court was divided on some points, a majority held that the fee was subject to *Dolan*'s heightened scrutiny test. The plurality decision emphasized that the city had exercised discretionary power in imposing and calculating the fee, rather than doing so pursuant to a legislative mandate or formula. Thus, even though the condition involved the payment of money rather than a dedication of land, the fee had the same potential for illegitimate leveraging that was central to the Court's rationale in *Dolan. Ehrlich*, 911 P2d at 438. The plurality reasoned:

---

[11] *See generally Parking Ass'n of Georgia, Inc. v. City of Atlanta*, 515 US 1116, 115 S Ct 2268, 132 L Ed 2d 273 (1995) (Thomas, J., dissenting from denial of certiorari) (collecting lower court cases in conflict); *Garneau v. City of Seattle*, 147 F3d 802, 811 (9th Cir 1998) (there is "considerable doubt" about the applicability of the *Dolan* rough proportionality test to "legislative, as opposed to administrative exactions" and to "fee exactions, as opposed to physical exactions").

"There is no question that the takings clause is specially protective of property against *physical occupation* or invasion—a proposition that the court's opinion in *Loretto* * * * makes clear. It is also true, as the city points out, that government generally has greater leeway with respect to noninvasive forms of land use regulation, where the courts have for the most part given greater deference to its power to impose broadly applicable fees, whether in the form of taxes, assessments, user or development fees. [Representative cases] dealt with such legislatively formulated development assessments imposed on a broad class of property owners. Fees of this nature may indeed be subject to a lesser standard of scrutiny than that formulated by the court in *Nollan* and *Dolan* because the heightened risk of the 'extortionate' use of the police power to exact unconstitutional conditions is not present. Nonetheless, we reject the proposition that *Nollan* and *Dolan* are entirely without application to monetary exactions. When such exactions are imposed—as in this case—neither generally nor ministerially, but on an individual and discretionary basis, we conclude that the heightened standard of judicial scrutiny in *Nollan* and *Dolan* is triggered."

*Id.* at 443-44 (emphasis in original).

Justice Mosk, concurring, observed that development fees calculated according to "preestablished legislative formulae based on square footage or per unit of development" bear a close resemblance to excise taxes, assessment fees, and user fees that are tested pursuant to standards that are deferential to the authority of government to impose them. But Justice Mosk agreed with the plurality that *Dolan*'s more exacting scrutiny should apply because the disputed fee was not legislatively imposed:

"[The risk of extortionate behavior on the part of government] diminishes when the fee is formulated according to preexisting statutes or ordinances, which purport to rationally allocate the costs of development among a general class of developers or property owners—indeed, as discussed above, the separation of powers doctrine clothes such a fee in a presumption of constitutionality. But when the fee is ad hoc, enacted at the time the development application was approved, there is a greater likelihood that it is motivated by the desire to extract the maximum revenue from the property owner seeking the development permit, rather

than on a legislative policy of mitigating the public impacts of development or of otherwise reasonably distributing the burden of achieving legitimate government objectives."

*Id.* at 459-60 (Mosk, J., concurring); *see also id.* at 465 (Kennard, J., concurring and dissenting) (*Dolan* should apply to the recreation fee because that fee was imposed on the development application individually rather than pursuant to an ordinance or rule of general applicability).

In its more recent decision in *San Remo Hotel*, the California Supreme Court had its first opportunity to authoritatively address the analysis that should apply to a development fee imposed through a generally applicable legislative enactment. The case involved a challenge to a housing replacement fee imposed on hotel owners who proposed to alter the use of their property by renting rooms to tourists or other daily renters, rather than to longer-term residents. If the developer did not want to construct or otherwise bring onto the market alternative housing units, the developer could pay an "in lieu" fee that would help fund government construction of low- and moderate-income housing. *San Remo Hotel*, 41 P3d at 92. Adhering to the distinction it drew in *Erhlich*, the court observed that the *sine qua non* for application *of Dolan*'s heightened scrutiny test was the discretionary deployment of the police power in the imposition of land use conditions in individual cases. *Id.* at 105. But the fee in dispute did not qualify as a discretionary condition. Rather, it was one in which "no meaningful government discretion enter[ed] into either the imposition or the calculation of the in lieu fee." *Id.* at 104. In particular, because the fee was mandatory for any developer proposing such a conversion who chose not to provide replacement housing, the developer in *San Remo* was not "singled out" for payment of the fee. *Id.* Nor was the amount of the fee discretionary, because it was determined according to a set formula based on replacement cost, which in turn was based on independent appraisals. *Id.* Thus, the court held, *Dolan* did not apply.

As earlier noted, lower courts extending *Dolan* to development fees almost uniformly have followed the distinction identified in *Erhlich* and *San Remo Hotel*, thus limiting *Dolan* to monetary exactions that are imposed and calculated

on a discretionary and adjudicatory basis. *See Home Builders Association of Central Arizona v. City of Scottsdale*, 187 Ariz 479, 486, 930 P2d 993, *cert den* 521 US 1120 (1997); *Krupp v. Breckenridge Sanitation Dist.*, 19 P3d 687, 698 (Colo 2002); *Waters v. Montgomery County*, 337 Md 15, 650 A2d 712, 724 (1994); *Town of Flower Mound v. Stafford Estates Ltd. Partnership*, 71 SW3d 18 (Tex App 2002). The only case we have identified that explicitly has extended heightened scrutiny to a generally applicable legislatively imposed development fee is *Home Builders Ass'n of Dayton v. City of Beavercreek*, 89 Ohio St 3d 121, 729 NE2d 349 (2000).[12] Whether the court in that case actually applied heightened scrutiny, however, is questionable.[13]

## C. *Oregon Jurisprudence and Analysis of the TIF*

Our own cases have sorted through some, but not all, of the questions left unanswered by the Court's decisions in *Nollan* and *Dolan*. In particular, we have been called on to decide whether heightened scrutiny should be extended to legislatively authorized dedication requirements. The first of

---

[12] Although petitioner also relies on the decision of the Washington intermediate appellate court in *Benchmark Land Co.*, that case is not helpful authority. It is unclear from the opinion whether the challenged development fee was imposed pursuant to an individualized process or whether it was legislatively mandated and nondiscretionary. The court does not discuss the distinction. The court's opinion merely describes the fee as having been imposed in the course of the city's issuance of a development permit; nothing suggests that the fee is part of a comprehensive, detailed, and nondiscretionary legislative conditioning process. *See Benchmark Land Co.*, 14 P3d at 172-73.

[13] The *Home Builders Ass'n of Dayton*, decision, although stating that *Dolan* should apply, did not seem to adhere to that test in its analysis. The court determined that the first prong of the *Nollan/Dolan* test ("essential nexus") was satisfied by a showing that the "methodology" used to determine the need for a traffic impact fee was based on "generally accepted traffic engineering practices." *Home Builders Ass'n of Dayton*, 729 NE2d at 356. The court determined that the second prong of the test ("rough proportionality") was satisfied by the existence of a "reasonable relationship" between "the fee paid and *the benefits accruing to developers.*" *Id.* at 358 (emphasis added). The court made no individualized assessment of proportionality at all but instead reviewed the legislation from a facial perspective as it applied to developers generally. The court's analysis is difficult to square with *Dolan* and, in fact, mirrors the more deferential test traditionally used for user fees and other purely monetary assessments. *See, e.g., Sperry*, 493 US at 60-66 (fee charged to support a government service is not tested for proportionality in specific individual cases but must simply be a "fair approximation of the cost of benefits" provided by the government-funded program that the fee supports); *Webb's Fabulous Pharmacies v. Beckwith*, 449 US 155, 163, 101 S Ct 446, 66 L Ed 2d 358 (1980) (similar holding).

those cases was *Schultz*, in which a local ordinance authorized and required dedications in exchange for development permits. The city argued that the legislative authorization for the dedications distinguished them from those imposed in *Dolan*. In rejecting that argument, we first observed that the petitioners were not challenging the validity of a "legislative or quasi-legislative enactment that is applied generally to all similarly situated properties" but were, instead, challenging imposition of a particular set of conditions applied to their particular property. *Schultz*, 131 Or App at 227. In other words, we appear to have suggested that there were significant discretionary aspects to the land use decision in that case. We further observed:

> "[Even if the city is correct that the decision to impose the conditions is a legislative one,] the character of the restriction remains the type that is subject to the analysis in *Dolan*. In drawing its distinction between the legislative land use decisions that are entitled to a presumption of validity and the exactions that are not, the Supreme Court noted that what triggers the heightened scrutiny of exactions is the fact that they are 'not simply a limitation on the use' to which an owner may put his or her property, but rather a requirement that the owner *deed portions of the property to the local government.* That is precisely the nature of the exaction imposed by the city in this case."

*Id.* (emphasis added; citation to *Dolan* omitted). Thus, our resolution was predicated explicitly on the *nature* of the condition involved in that case, namely, a physical occupation of property in the form of a dedication of property. We have since adhered to that position, at least in the context of property dedications that, although legislatively authorized, have involved discretion in determining the actual nature and scope of the condition to be imposed. *See J.C. Reeves Corp.*, 131 Or App at 623-24, 623 n 1. We also have since reserved the question of whether we would reach the same conclusion for dedications imposed pursuant to legislatively adopted criteria that are "sufficiently detailed and uniformly applied to obviate" *Dolan*'s concerns about ad hoc exactions. *McClure v. City of Springfield*, 175 Or App 425, 435 n 6, 28 P3d 1222 (2001).

In *Clark v. City of Albany*, 137 Or App 293, 904 P2d 185 (1995), *rev den* 322 Or 644 (1996), we also held that monetary exactions can be subject to heightened scrutiny under *Dolan*. In *Clark*, a city required a developer, as part of a site approval process for construction of a fast-food restaurant, to restrict his use of the developed property in certain ways and to make improvements to the site as well as to property adjacent to the site. We concluded that "not all conditions of approval come within the ambit of the *Dolan* test" and we held, in particular, that conditions requiring traffic-free areas on the site and site modifications (such as meeting storm drainage requirements) were use regulations, not exactions subject to *Dolan*. *Clark*, 137 Or App at 300, 301-02. We reached an opposite conclusion, however, with respect to the condition that the developer fund adjacent street improvements. We explained:

> "For purposes of takings analysis, we see little difference between a requirement that a developer convey title to the part of the property that is to serve a public purpose, and a requirement that the developer himself make improvements on the affected and nearby property and make it available for the same purpose. The fact that the developer retains title in, or never acquires title to, the property that he is required to improve and make available to the public, does not make the requirement any the less a burden on his use and interest than corresponding requirements that happen also to entail memorialization in the deed records."

*Id.* at 300. Thus, *Clark* became authority for the proposition that monetary exactions, as well as dedications, could be subject to *Dolan*'s heightened scrutiny test.[14]

---

[14] *Clark*, however, did not necessarily settle the question of whether a requirement to pay money in exchange for a development permit or other approval necessarily falls within the range of exactions subject to analysis under *Dolan*. A few years after we decided *Clark*, the Supreme Court issued its decision in *Del Monte Dunes at Monterey, Ltd.*, which involved a development denial, rather than a permit conditioned on either a monetary exaction or dedication of property. In its opinion, the Court refused to subject the denial to *Dolan*'s heightened scrutiny test, cautioning that it had not "extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land use decisions conditioning approval of development on the *dedication of property to public use*." 526 US at 701 (emphasis added). Other courts have noted the Court's comment and, because of it, have either declined or expressed reluctance to apply *Dolan*'s analysis to exactions that do not involve property dedications. *See, e.g.*, *Clajon*, 70 F3d at 1578; *Krupp*, 19 P3d at 698. This is not an appropriate case to reexamine *Clark* in light of *City of*

But *Clark* involved an ad hoc adjudicatory imposition of a monetary exaction, not a generally applicable and legislatively imposed development fee. We therefore did not have the occasion in *Clark* to consider or decide whether *Dolan* extends to any and all monetary assessments imposed as part of a development approval, nor did we purport to make such a global holding. To the contrary, we held only that the adjacent street improvements required in that case were subject to *Dolan*, while also expressly cautioning as part of that holding that the case was otherwise "not the appropriate one for universal line-drawing." *Id.*[15]

■ This case therefore presents us with the first opportunity to consider whether development or impact fees, when imposed on broad classes of property and when calculated pursuant to a legislatively set formula, are subject to *Dolan*'s heightened scrutiny test. In that regard, petitioner asserts that the TIF is imposed through an ad hoc adjudicatory process. But petitioner does not explain how that is so, nor does the legislative scheme itself support petitioner's assertion.

To the contrary, by the terms of the ordinance, imposition of the TIF is mandatory on "all development in the county, including inside cities," subject to only a few specified exceptions (*e.g.*, remodeling of single- and multi-family structures and remodeling of commercial, business, and industrial structures in ways that do not generate additional average weekday trips). *See* WCC § 3.17.040(B). Appendix A to the ordinance, which lists the land use categories to which the

---

*Monterey* or other later jurisprudential developments because this case can be resolved on the narrower ground of whether *Dolan* correctly extends to generally applicable legislatively imposed development fees.

[15] Our decisions in *Lincoln City Chamber of Comm. v. City of Lincoln City*, 164 Or App 272, 991 P2d 1080 (1999), *rev den* 330 Or 331 (2000), and *Art Piculell Group* also applied *Dolan* to zoning ordinances requiring developers to agree to dedications and other exactions as conditions of development. The challenge in *Lincoln City Chamber of Commerce* was a narrow one: whether the city could place the burden on the developer to submit an engineering report addressing proportionality issues. Although we did not explicitly address *Dolan*'s application to legislatively authorized monetary exactions, we did observe that the conditions authorized by the ordinance were subject to *Dolan* because they were imposed pursuant to an individualized adjudicative process. *Lincoln City Chamber of Comm.*, 164 Or App at 277-78. We did not discuss the legislative/adjudicative distinction at all in *Art Piculell Group*, but our description of the conditions imposed in that case makes clear that the process involved was adjudicatory and ad hoc in nature. 142 Or App at 329-30.

TIF applies, consists of more than 110 specifically identified uses falling under the more general headings of residential, institutional, business and commercial, and office uses. The list, while perhaps not exhausting the full universe of possible land uses, at the least is very comprehensive. For example, residential uses include single-family detached housing, retirement communities, mobile homes, and different categories of apartment and condominium complexes. Institutional uses span too large a group to canvass here. To give only a few examples, however, they encompass such things as waterways, marinas, railroad terminals, airports, theaters, camps, schools, dog/horse/auto race facilities, churches, nursing homes, hospitals, military bases, and courts. Business and commercial uses are likewise too numerous to list here. But they include hotels, retail stores, specialty retail stores, stores that sell particular products (*e.g.*, lumber, apparel, tires, hardware/paint, and so on), shopping centers based on overall size, restaurants of various kinds, car washes, car dealerships, service stations, and even video arcades. Finally, office uses encompass, among others, clinics, general office space (based on size), medical offices, insurance offices, industrial parks, warehouse facilities, federal post facilities, and utility offices. *See generally* WCC ch 3.17, Appendix A.

For each listed use, the ordinance specifies the "basis for trip determination" (BTD) that applies. Thus, as examples, the BTD for a utility office is the number of employees; for a service station, it is the number of pumps; for a nursing home, it is the number of beds; for a school, it is the number of students; for single family housing, it is the number of units of housing; for a movie theater, it is the number of parking spaces provided; for a city park, it is acreage; for a commercial shopping center, it is gross leasable square footage. *Id.*

Finally, the ordinance expressly sets the fee amount charged for each trip that the development potentially can generate. Residential, office, and industrial developments are charged $135, $124 and $130, respectively, per average weekday trip. Business and institutional developments are charged $34 and $56, respectively, per average weekday trip. WCC § 3.17.050(A).[16]

---

[16] As earlier noted, the rates increased after petitioner pursued its initial administrative appeal. The significance of the rates, and the point of our citation to

As that overview of the TIF ordinance reveals, no significant discretion is involved in the TIF's imposition or calculation. Imposition of the TIF is mandatory on broad classes of property. Indeed, nearly all proposed development that conceivably would burden the street and arterial infrastructure within the county is subject to the mandatory fee. Calculation of the fee is, likewise, nondiscretionary.[17] To be sure, because different uses vary in the burden they place on street and arterial infrastructure, the legislation uses a classification scheme to adjust the fee based on those differences. Such classification is common for any number of generally applicable legislative tax, fee, and other assessments; legislative classifications do not render the scheme adjudicatory or discretionary. The TIF ordinance is, in short, precisely the kind of detailed and uniformly applied legislative assessment scheme that courts in other states hold does not fall within the express reach or the implicit rationale of *Dolan's* heightened scrutiny test.

The only remaining question, then, is whether we agree with those courts. We do. In our view, the reasoning set out by the California Supreme Court in its opinions in *Erhlich* and *San Remo Hotel*, which we described earlier, is persuasive. As our own discussion of *Nollan/Dolan* highlights, and as *Erhlich* and *San Remo Hotel* accurately

them, is not their actual dollar amount but the degree to which the ordinance itself sets the basis for calculation of the TIF rather than having it depend on an adjudicatory exercise of discretion.

[17] An element of discretion can enter into the calculation of the TIF *if* the proposed development does not fall into one of the use categories listed in section 3.17.050, Appendix A, a situation that is not implicated here. In that circumstance, the director of the department of land use and transportation (or a city officer designated to administer the TIF) is directed to base the TIF on the use or uses listed in Appendix A that are most similar in traffic generation to the use proposed by the developer. WCC § 3.17.050(B)(1). At the developer's election and expense, the director may alternatively consider actual trip generation information as verified by a registered traffic engineer. In that circumstance, the director then may adjust the basis for calculating the fee, considering the "location, size and other appropriate factors in determining the average weekday trip." WCC § 3.17.050(B)(2). Again, this case does not involve a use that does not fit within one or more of those specified in Appendix A, and the director's discretion in that regard is not implicated. We therefore need not determine whether the nature of that discretion is sufficiently channeled by objective criteria, including the engineering evidence that the developer itself provides, that it avoids the kind of ad hoc adjudicatory decision that troubled the Court in *Dolan*. *See San Remo Hotel*, 41 P3d at 104 (fact that in lieu fee involved calculation on the basis of real estate appraisals did not render it discretionary or ad hoc).

observe, the two-pronged heightened scrutiny that the Court adopted in *Dolan* was animated by the Court's particular concern with the sort of governmental leveraging that can arise in case-by-case adjudicatory imposition of development conditions. The Court also was expressly concerned with the *nature* of the conditions imposed—*i.e.*, dedications of property to public use. The nature of the exaction involved here— a monetary assessment in the form of a traffic impact tax or fee—coupled with its imposition and calculation through a detailed legislative formula meaningfully distinguishes this condition from those in *Nollan/Dolan*. As the court in *San Remo Hotel* recognized:

> "While legislatively mandated fees do present some danger of improper leveraging, such generally applicable legislation is subject to the ordinary restraints of the democratic political process. A city council that charged extortionate fees for all property development, unjustifiable by mitigation needs, would likely face widespread and well-financed opposition at the next election. Ad hoc individual monetary exactions deserve special judicial scrutiny mainly because, affecting fewer citizens and evading systematic assessment, they are more likely to escape such political controls.
>
> "* * * * *
>
> "Finally, we should not lose sight of the constitutional background. To put the matter simply, the taking of money is different, under the Fifth Amendment, from the taking of real or personal property. The imposition of various monetary exactions—taxes, special assessments, and user fees— has been accorded substantial judicial deference."

41 P3d at 105-06 (Mosk, J., concurring) (internal quotation marks omitted) (citing *Ehrlich*, 911 P2d at 429).

We agree with that reasoning and adopt it. We also agree with the concurring opinion in *Erhlich,* which rhetorically observed that there would be little sense in using a deferential standard of review for taxes and other general assessments, while simultaneously using a more exacting standard for development fees that differ only in how they are spent:

> "[I]f a municipality can constitutionally impose a development tax as long as it is rationally based, why is a higher

level of constitutional scrutiny required when, *as in the case of generally applicable development fees*, the 'tax' is earmarked for use in alleviating specific development impacts rather than for the general fund?"

*Erhlich*, 911 P2d at 455 (Mosk, J., concurring) (emphasis added). Our response is equally rhetorical: Why indeed? There is no principled basis on which to distinguish generally applicable development fees that fund the infrastructure expansion needed to support new development from other legislatively imposed and generally applicable taxes, assessments, and user fees. We therefore join the several courts in other jurisdictions that have held that *Dolan* does not apply to such legislatively imposed and calculated development fees.

■　That conclusion resolves petitioner's constitutional challenge in this case. Petitioner's only argument is that the TIF is a taking because the city did not make a sufficiently *individualized* determination of the traffic impacts that would be generated by his particular development proposal. Because we hold that the more exacting scrutiny required under *Dolan* does not apply to the TIF, no individualized determination was necessary. Petitioner does not challenge the TIF on any other takings theory and, consequently, the trial court properly dismissed the writ.

## IV.　CONCLUSION

To review, we reject petitioner's statutory as well as its constitutional challenges to the imposition of the TIF in this case. Regarding petitioner's statutory challenge, we ·agree with petitioner that the TIF qualifies as a system development charge (SDC) and that it therefore generally must comply with the provisions of ORS chapter 223 governing such charges. Petitioner's only statutory challenge is that the TIF *does not comply with the requirement in ORS 223.304(2)* that SDCs be calculated using "a methodology that considers the cost of protected capital improvements needed to increase the capacity of the systems to which the fee is related." That challenge is barred by ORS 223.304(5), which requires that it have been brought within 60 days after the adoption or modification of the TIF ordinance.

Regarding petitioner's federal takings claim, our prior cases have held that monetary exactions imposed through ad hoc adjudicatory challenges can be subject to *Dolan*'s heightened scrutiny, as can be legislatively authorized dedications of property. But the prior cases presenting those issues all have involved authorizing legislation that left significant discretion in the identification and imposition of the particular conditions to be applied to individual development proposals. Until this case, we have not had the opportunity to authoritatively resolve whether *Dolan* also extends to a generally applicable development fee imposed on a broad range of specific, legislatively determined subcategories of property through a scheme that leaves no meaningful discretion either in the imposition or in the calculation of the fee. We conclude that the TIF is such an assessment, and we are persuaded by the reasoning of other state courts, representing a nearly unanimous view, that *Dolan*'s heightened scrutiny test does not extend to development fees of that kind. We therefore conclude that the trial court correctly rejected petitioner's constitutional challenge to the TIF.

Affirmed.