Argued and submitted July 16, 2002, affirmed January 15, 2003

HOMEBUILDERS ASSOCIATION OF
METROPOLITAN PORTLAND,
an Oregon non-profit corporation;
Matrix Development Corporation,
an Oregon corporation;
Ernie Platt;
and Vista Northwest, Inc.,
an Oregon corporation,
*Appellants,*

*v.*

TUALATIN HILLS PARK AND
RECREATION DISTRICT,
an Oregon municipal corporation,
*Respondent.*

C99-0057CV; A111827

62 P3d 404

Stephen F. Crew argued the cause for appellants. With him on the briefs were Jeff H. Bachrach, T. Chad Plaster, and Ramis Crew Corrigan & Bachrach, LLP.

Peter R. Mersereau argued the cause for respondent. On the brief were Thomas W. McPherson and Mersereau & Shannon, LLP.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

SCHUMAN, J.

## SCHUMAN, J.

Several real estate developers and a developers' association brought this action against defendant, Tualatin Hills Park and Recreation District (the district), a municipal corporation, alleging that the district's resolution creating a system development charge did not comport with statutory provisions and that it violated a variety of state and federal constitutional guarantees. The trial court granted the district's motion for partial summary judgment on the constitutional claims. Plaintiffs appeal, and we affirm.

A system development charge (SDC) is a one-time fee imposed by a government unit on new developments, used to help offset financial costs resulting from the growth associated with those new developments. Oregon law authorizes government units to pass resolutions imposing SDCs that mitigate the costs of, among other things, new park and recreation facilities. ORS 223.297 - 223.314. Pursuant to that authorization, on November 17, 1998, after reviewing the work of consultants, several preliminary drafts, and extensive written and oral testimony from members of the public (including plaintiff Homebuilders' Association), the district's board of directors, acting in its capacity as a quasi-legislative governing body, unanimously adopted a "Resolution to Establish a Parks and Recreation System Development Charge on New Development Applicable at the Time of Application for a Building Permit." The resolution sets out its rationale as follows:

> "New Development within the Tualatin Hills Park and Recreation District contributes to the need for capacity increases and upgrades to capital improvements for parks and recreation facilities and, therefore, New Development should contribute to the funding for such capital improvements. This SDC will fund a portion of the needed capacity increases for parks and recreation facilities as identified in the Tualatin Hills Park and Recreation District Parks and Recreation SDC Capital Improvements Plan (CIP), and will reimburse the District for a portion of the cost of excess capacity facilities available to serve New Development."

In accordance with ORS 223.297 to 223.314, the district's resolution contains provisions controlling how the SDC is to be

calculated (a "methodology report"), how to obtain exemptions from the SDC, how to obtain credits against the SDC, how to challenge expenditure of SDC revenues, and how to challenge the "methodology."

Plaintiffs attacked the district's resolution in a "petition for writ of review/complaint" containing four claims. The first claim encompassed the petition for a writ of review and contained three "counts": Count 1 alleged statutory violations, Count 2 alleged violations of the Takings Clause of Article I, section 18, of the Oregon Constitution,[1] and Count 3 alleged violations of the Takings Clause of the Fifth Amendment to the United States Constitution.[2] The second, third, and fourth claims sought declaratory relief and damages, outside of the writ of review, for constitutional violations: the second claim, for a violation of the Oregon Constitution's Takings Clause; the third, under 42 USC section 1983, for violation of the federal Takings Clause; and the fourth, under 42 USC section 1983, for a violation of "Substantive Due Process" under the Fourteenth Amendment. In motions to dismiss and subsequently for partial summary judgment, the district maintained that, first, the writ of review provided the exclusive method for reviewing the district's action and, second, the resolution was not unconstitutional. The trial court ultimately entered judgment against plaintiffs on all of their constitutional claims, that is, on the second two counts of the first claim and on the second, third, and fourth claims in their entirety. Plaintiffs appeal.

Before dealing with the constitutional issues, we must discuss two preliminary questions. Most immediately, we must determine the rationale of the trial court's judgment. According to plaintiffs, the judgment effects only the

---

[1] Article I, section 18, of the Oregon Constitution provides, in part:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation * * *."

[2] The Fifth Amendment to the United States Constitution provides, in part:

"[N]or shall private property be taken for public use, without just compensation."

The Fifth Amendment is made applicable against states by the Fourteenth Amendment. *Chicago, Burlington & c. R'D v. Chicago*, 166 US 226, 239, 17 S Ct 581, 41 L Ed 979 (1897). Subsequent references to the Fifth Amendment are to that amendment as applied to states through the Fourteenth Amendment.

trial court's conclusion that the writ of review is the exclusive avenue of appeal. They point to a portion of the transcript where the court comments, "I'm narrowly dealing with * * * the motion for partial summary judgment that says can you legally bring this kind of proceeding or are you legally limited to a writ of review." We should decide only that issue, plaintiffs maintain, and then remand for a trial on the merits of the constitutional claims. The district, on the other hand, points to a portion of the transcript where the court comments:

> "The legal issue is whether or not you have these constitutional claims or constitutional procedural claims on top of the writ of review. And I am satisfied, in having read the documents prepared, that the motion for partial summary judgment should be granted, and I adopt the arguments presented by the defense in that matter."

Those arguments, the district contends, included—indeed, emphasized—the substantive constitutionality of the resolution. The district urges us, therefore, to decide that issue.

We agree with the district. The transcript itself may be ambiguous, but the judgment is not. It dismissed *all* of the constitutional claims and *only* the constitutional claims: the second, third, and fourth claims, and the constitutional counts under the first claim. That outcome cannot be explained under plaintiffs' theory because, if the court's sole rationale was the exclusivity of the writ of review, it would have had no reason to dismiss the constitutional components of the first claim. The trial court's judgment makes sense only if we regard it as a determination of the constitutional claims on their merits, and we therefore treat it as such.

■ We must also address the question of standing. The district maintains that plaintiffs' complaint fails to allege a justiciable controversy because it is purely speculative; the only injury it asserts is that, "[i]f the Court does not grant the relief for which Petitioners/Plaintiffs pray, members of the HBA, including Matrix, Platt, and Vista, will experience substantial injury by being required to pay an illegal exaction." Even if the district were correct that plaintiffs' statement falls short of alleging a justiciable controversy, the district's standing argument nonetheless fails. Plaintiffs point out that

the combined petition and complaint also alleges that, "[a]s a result of the SDC Resolution and SDC Methodology, Petitioners/Plaintiffs Matrix, Platt, and Vista *have been forced to pay* an illegal exaction," along with a similar allegation that plaintiffs seek restitution or damages "in the amount of the unlawful SDC fees they *have paid*." (Emphasis added.) We conclude that the combined complaint and petition alleges that the SDC resolution has a practical effect on the interests of at least some plaintiffs.[3] The pleading presents a justiciable controversy. *Barcik v. Kubiaczyk*, 321 Or 174, 182, 895 P2d 765 (1995) (justiciable controversy exists when the court's decision will have a practical effect on the rights of parties).

■ We begin with the Oregon constitutional claim. That claim might be interpreted in two ways. First, it might be a claim that, by requiring plaintiffs to pay an SDC as a condition of developing their real property, the district imposes a regulatory taking of a portion of that property because exacting the charge reduces the property's value. Even if we were to assume that exacting money as a condition of development could be considered a regulatory taking for purposes of Article I, section 18—an issue we emphatically do not decide—plaintiffs' claim would fail. The Oregon Supreme Court has not created exceptions to the general rule that, in order to establish a regulatory taking under Article I, section 18, a property owner must show that the government has deprived the owner of "all substantial beneficial or economically viable use of the property." *Deupree v. ODOT*, 173 Or App 623, 630, 22 P3d 773 (2001), *rev den*, 334 Or 397 (2002) ("[A] regulatory taking under Article I, section 18, occurs only where the property owner is deprived of all substantial beneficial or economically viable use of the property."). Plaintiffs do not, and could not, allege that conditioning the development of their real property on payment of an SDC rendered the real property devoid of all economically viable use.

---

[3] We need not decide whether Homebuilders Association has standing. We address standing only to determine whether *any* plaintiff has standing so as to confer on us the jurisdiction to reach the merits.

Alternatively, plaintiffs' argument could be that, in imposing the SDC, the district appropriates plaintiffs' money and that act itself amounts to a taking, regardless of its connection to the development of their real property. Under that theory, in other words, the unconstitutional taking is the taking of money and not the reduction in the value of real property. Plaintiffs, however, offer no arguments demonstrating that Article I, section 18, would support such a sweeping conclusion—one that would, for example, subject the income tax to a takings attack. No Oregon court has ever suggested that a legislatively imposed exaction of money, applicable generally to a large group of people, can be challenged as a taking and, in the absence of arguments to that effect, we will not reach such a radical conclusion. The trial court did not err in granting the district's motion for summary judgment insofar as it was directed at plaintiffs' claims under the Oregon Constitution.

■        Plaintiffs' claims under the Fifth Amendment present a slightly more complex problem. That is so because United States Supreme Court opinions on the subject of exactions, like so much of that Court's jurisprudence, rely on "tests" composed of vague, abstract, and elastic phrases such as "rough proportionality," "reasonable relationship," and "rational basis." *See, e.g., Dolan v. City of Tigard*, 512 US 374, 391, 114 S Ct 2309, 129 L Ed 2d 304 (1994) (distinguishing among those tests). The phrases act as shorthand formulations advising judges how rigorously they must examine the degree to which (or the efficiency with which) a particular legislative choice of means will further the accomplishment of a particular legislative policy choice. The problems inherent in such a jurisprudence are evident. The phrases force into a few discrete categories (or "tiers of scrutiny") what in reality are infinite gradations along a spectrum. More notoriously, because the phrases are so imprecise and subjective, once the Court decides which test to apply, the application too frequently becomes a conclusion instead of a legal analysis. Further, the phrases state standards for judges to apply on a case-by-case basis, after the fact, thereby depriving government actors of useful guidance and citizens of predictability. *See generally* Antonin Scalia, *The Rule of Law as a Law of*

*Rules*, 56 U Chi L Rev 1175 (1989). Nevertheless, in deciding cases under the United States Constitution, we must follow the path chosen by the United States Supreme Court and can only attempt to avoid the pitfalls along the way.

As originally briefed, the parties' arguments in this case centered on whether the appropriate test of the district's resolution was the "rough proportionality" test or the "rational basis" test. The former derives from two United States Supreme Court cases: *Nollan v. California Coastal Comm'n*, 483 US 825, 837-38, 107 S Ct 3141, 97 L Ed 2d 677 (1987), and *Dolan,* 512 US at 391. In *Nollan,* the Court held that, if government imposes an exaction on the development or use of real property, that exaction is a "taking" under the Fifth Amendment unless there is an "essential nexus" between the exaction itself and the goal that the exaction is designed to achieve. 483 US at 837-38. In *Dolan,* the Court held that, even when an "essential nexus" exists, the government unit imposing an exaction on development "must make some sort of individualized determination" that the extent of the burden imposed by the exaction is "rough[ly] proportional[ ]" to the impact that the proposed development would have and that the exaction would address. 512 US at 391. Plaintiffs in the present case originally contended that *Nollan* and *Dolan* applied, even though in each of those cases the government made an *ad hoc* determination that a would-be developer had to relinquish some portion of physical ownership of real property.

■    The district maintained that neither *Nollan* nor *Dolan* apply where, as here, the government enacted a legislative or quasi-legislative measure that impose only a monetary exaction, generally applicable to similarly situated properties. According to the district, such an enactment is not a taking at all, but ordinary social or economic legislation and, as such, is subject only to the extremely deferential "rational basis" test under the Due Process Clause. Under that standard, an enactment is constitutional if any rational legislator could have believed that it furthers some legitimate governmental objective, even if in so doing it is flagrantly underinclusive, grossly overbroad, unnecessary, or silly. *See, e.g., Williamson v. Lee Optical Co.*, 348 US 483, 487-88, 75 S Ct 461, 99 L Ed 563 (1955) (statute permitting optometrists but

not opticians to fit eyeglasses, although perhaps "needless" and "wasteful," does not violate Due Process Clause because legislature "might have concluded" that the public was served by requiring an eye exam every time a person bought new lenses; "[t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions").

**6.**     After this case was briefed, we decided *Rogers Machinery, Inc. v. Washington County*, 181 Or App 369, 45 P3d 966, *rev den*, 334 Or 492 (2002).[4] In that case, the plaintiff challenged a "Traffic Impact Fee" assessed by the county against property developers and used to provide funds for street improvements. *Id.* at 371. We held that the "Traffic Impact Fee" was a species of SDC for purposes of ORS 223.297 to 223.314 and that, as such, it was not within the scope of government action affected by *Nollan* and *Dolan*. *Rogers Machinery, Inc.*, 181 Or App at 400. In memoranda of additional authorities, the parties in this case do not suggest any meaningful distinction between the Traffic Impact Fee in *Rogers Machinery, Inc.*, and the SDC in this case, nor do we discern one. Like the Traffic Impact Fee, the SDC is "a generally applicable development fee imposed on a broad range of specific, legislatively determined subcategories of property through a scheme that leaves no meaningful discretion either in the imposition or in the calculation of the fee." *Id.* Both measures require property developers to pay a fee; in both, the fees are calculated by means of a carefully determined formula based on the impact the development will have on infrastructure; in both, the fees are dedicated to mitigating that impact. We therefore conclude that, pursuant to *Rogers Machinery, Inc.*, the *Nollan/Dolan* "rough proportionality" test does not apply in determining whether the SDC in this case is a taking for Fifth Amendment purposes.

Recognizing the inevitability of this conclusion in light of *Rogers Machinery, Inc.*, and noting that, in *Rogers Machinery, Inc.*, we quoted approvingly from *Erhlich v. City of Culver City*, 12 Cal 4th 854, 50 Cal Rptr 2d 242, 911 P2d

---

[4] The plaintiff in *Rogers Machinery, Inc.*, filed a petition for *certiorari* in the United States Supreme Court. That petition is pending. 71 USLW 3367 (Nov 12, 2002) (No. 02-750).

429, *cert den*, 519 US 929 (1996), plaintiffs in supplemental briefing suggest that we adopt the "reasonable relationship" test described in Justice Mosk's *Erhlich* concurrence as appropriate for legislatively imposed development fees. *Erhlich*, 12 Cal Rptr 4th at 897, 911 P2d at 458. What that test means, however, is not self-evident.

In some contexts, the test appears to be quite similar to the "rough proportionality" test required by *Dolan*, where the Court chose "rough proportionality" over "reasonable relationship" because the latter phrase was "confusingly similar to the term 'rational basis' which describes the minimal level of scrutiny under the Equal Protection [and Due Process] Clause[s] of the Fourteenth Amendment." *Dolan*, 512 US at 391. The Court wanted a different test for *ad hoc* exactions of possessory interests. This court, too, has noted that, when used to evaluate an *ad hoc* nonmonetary condition on development, the "reasonable relationship" test "does not differ sharply" from the "rough proportionality" test. *Art Piculell Group v. Clackamas County*, 142 Or App 327, 331, 922 P2d 1227 (1996).

■ However, the SDC at issue here is not an *ad hoc* exaction, but a quasi-legislative one. It has long been axiomatic that legislative and quasi-legislative enactments enjoy a significantly higher degree of judicial deference than individualized adjudications. In *Bi-Metallic Co. v. Colorado*, 239 US 441, 445, 36 S Ct 141, 60 L Ed 372 (1915), concluding that individual property owners did not have the right to judicial relief for increases in their property taxes, the Supreme Court held:

> "General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule."

Legislative enactments, in general, need not reflect or be based on a factual "record": the court will "never require a legislature to articulate its reasons for enacting a statute * * *." *FCC v. Beach Communications, Inc.*, 508 US 307, 315, 113 S Ct 2096, 124 L Ed 2d 211 (1993). The principle is

reflected in, for example, the Administrative Procedures Act, which provides for "on the record" judicial review of contested cases, ORS 183.482, but more limited review of rules, ORS 183.400.

We therefore regard cases treating legislatively imposed fees as more relevant than *Dolan* and *Art Piculell Group*. A good example is *San Remo Hotel v. City and County of San Francisco*, 27 Cal 4th 643, 117 Cal Rptr 2d 269, 41 P3d 87 (2002). In that case, the court echoed its opinion in *Ehrlich* and announced that, as "a matter of both statutory and constitutional law, such [legislatively imposed development mitigation fees] must bear a reasonable relationship, in both intended use and amount, to the deleterious public impact of the development." *San Remo Hotel*, 117 Cal Rptr 2d at 291, 41 P3d at 105-06 (citing *Associated Home Builders etc., Inc. v. City of Walnut Creek*, 4 Cal 3d 633, 640, 94 Cal Rptr 630, 484 P2d 606 (1971)). The *San Remo Hotel* court went on to state that, although

> "the relationship between means and ends need not be so close or so thoroughly established for legislatively imposed fees as for ad hoc fees subject to *Ehrlich*, the arbitrary and extortionate use of purported mitigation fees, even where legislatively mandated, will not pass constitutional muster."

*San Remo Hotel*, 117 Cal Rptr 2d at 291, 41 P3d at 106. That statement, suggesting that an "arbitrary and extortionate" fee falls just short of meeting the standard described by the phrase "reasonable relationship," implies that the "reasonable relationship" test is only slightly more rigorous than the "rational basis" test. The court explained the rationale for this deference:

> "While legislatively mandated fees do present some danger of improper leveraging, such generally applicable legislation is subject to the ordinary restraints of the democratic political process. A city council that charged extortionate fees for all property development, unjustifiable by mitigation needs, would likely face widespread and well-financed opposition at the next election."

117 Cal Rptr 2d at 291, 41 P3d at 105. We agree.

The "reasonable relationship" standard advocated by plaintiffs, then, appears to describe a test that is slightly more exacting than the "rational basis" test. The district, on the other hand, urges us to apply the "rational basis" test—that is, to treat the SDC resolution not as a taking but as ordinary economic legislation, which is constitutional except in those rare circumstances where government action is so flawed that it offends fundamental rights "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 US 319, 325, 58 S Ct 149, 82 L Ed 288 (1937).

We find much logic in the district's position. The Takings Clause, it must be remembered, does not prohibit government from appropriating property. It requires only that, when government does so, it has to pay a fair price: Property shall not be taken "without just compensation." US Const, Amend V. Applying that command to the appropriation of money through fees or taxes yields an incoherent result: Government can take money, but only if it pays for it—that is, only if it gives the money back. An attack on legislation imposing fees or taxes does not seek compensation, just or unjust. It seeks invalidation of the legislation itself. That is an attack more appropriately couched in terms of the Due Process Clause, to the extent it is appropriately a constitutional (as opposed to political) attack at all. Such a conclusion would lead to application of the "rational basis" test.

■ That deferential treatment of legislatively mandated fees is reflected in opinions of the United States Circuit Court of Appeals for the Federal District. In *Kitt v. U.S.*, 277 F3d 1330, 1336 (Fed Cir 2002), the court quoted with approval its earlier case, *Commonwealth Edison Co. v. U.S.*, 271 F3d 1327, 1340 (Fed Cir 2001), *cert den,* ___ US ___ , 152 L Ed 2d 1051 (2002), in which it had held that the "mere imposition of an obligation to pay money * * * does not give rise to a claim under the Takings Clause of the Fifth Amendment." Stated somewhat more bluntly, "[r]equiring money to be spent is not a taking of property." *Atlas Corp. v. U.S.*, 895 F2d 745, 756 (Fed Cir), *cert den,* 498 US 811 (1990). Although the United States Supreme Court has applied the Takings Clause to exactions of money, it did so in cases where the money was in an identifiable fund rather than charged as a fee for service or a tax. *See Phillips v. Washington Legal*

*Foundation,* 524 US 156, 169-72, 118 S Ct 1925, 141 L Ed 2d 174 (1998); *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 US 155, 101 S Ct 446, 66 L Ed 2d 358 (1980). In a more relevant context, the Court has suggested that taking money through generally applicable fees or exactions is different from taking real property. In *United States v. Sperry Corp.,* 493 US 52, 62 n 9, 110 S Ct 387, 107 L Ed 2d 290 (1989), the Court observed that "money is fungible" and announced that, if a monetary deduction from awards made by the Iran-United States Claims Tribunal in favor of United States claimants were treated the same as a "physical occupation requiring just compensation, so would be any fee for services, including a filing fee that must be paid in advance. Such a rule would be an extravagant extension of *Loretto* [*v. Teleprompter Manhattan CATV Corp.,* 458 US 419, 102 S Ct 3164, 73 L Ed 2d 868 (1982) (holding that a regulation requiring a property owner to provide space on private property for cable television equipment was a taking)]."

The present case, however, does not require us to decide between plaintiffs' "reasonable relationship" test and the district's "rational basis," due process test. Even if we were to disregard the reasoning above and conclude that plaintiffs' test applies, the district's resolution would easily pass.

In applying the more stringent test, we first note and reject plaintiffs' contention that they were entitled to introduce expert testimony to the effect that the resolution's methodology was fundamentally defective and that the resolution does not establish a "reasonable relationship" between the SDC and new development. Plaintiffs argue that the affidavit of counsel describing the expert testimony is sufficient to raise an issue of fact regarding the constitutionality of the resolution and therefore sufficient to defeat the motion for summary judgment.

■ Such testimony, however, has no place in a challenge to the constitutional adequacy of legislation except, perhaps, where the legislation's validity is contingent on the existence of some set of preexisting facts—for example, where the constitutionality of an affirmative action plan depends on the existence of some specific demographic facts. *See, e.g.,*

*Richmond v. J. A. Croson Co.,* 488 US 469, 501-02, 109 S Ct 706, 102 L Ed 2d 854 (1989) (constitutional validity of affirmative action program for a governmental benefit depends on existence of "gross statistical disparity" between percentage of qualified minorities in the population and percentage of minorities receiving the benefit). That is not the situation here. In this case, as in most others involving constitutional challenges to the enactment, as opposed to the application, of legislation, constitutionality is a legal issue that we resolve without reference to adjudicative facts. *Vannatta v. Keisling,* 324 Or 514, 518, 931 P2d 770 (1997). "The sole question is whether, on *any* set of facts, the challenged law is invalid *in toto." Advocates for Effective Regulation v. City of Eugene,* 160 Or App 292, 310, 981 P2d 368 (1999) (emphasis in original). The opinion of an expert on whether or not the resolution's methodology represents a good policy choice, good mathematics, or even whether it reflects an accurate assessment of the district's needs may be something that the district, at its option, could have taken into consideration in formulating the resolution, and the opinion of an expert on whether or not a particular exaction is a nonarbitrary application of the methodology's formula may be relevant in an adjudication, but such opinions are not relevant in addressing the question whether, as a matter of law, the resolution meets a legal standard. We see no basis for treating the constitutional validity of the district's SDC resolution as though it were a question of fact for adjudication.[5]

We turn, then, to the resolution's methodology. Our summary is necessarily general; the actual methodology occupies 31 pages of narrative, tables, and charts. The methodology is based on the district's projected needs for future park and recreation facilities and improvements through 2015. Those needs are set out in a list of projects called the Capital Improvements Plan (CIP), derived by applying current service levels to projected future residential and nonresidential population. Each new project or improvement in the CIP is translated into dollars. The sum is the total amount of

---

[5] Our rejection of plaintiffs' offer of adjudicative evidence does not necessarily apply to their statutory challenge to the resolution.

money that the district will need to accommodate the growth caused by new development.

To calculate the SDC for new residential development, the district begins with the total cost of new park and recreation facilities and divides it by the projected residential population increase to arrive at an "improvement cost per new resident" figure. Using census data regarding the average number of residents per dwelling unit, that figure is expressed as an "improvement cost per new dwelling." Certain credits and discounts are then applied to that figure, resulting ultimately in a total one-time SDC of $1,950 per single-family unit, $1,499 per unit of a multi-family dwelling, and $1,375 per unit of manufactured housing.

To calculate the SDC rates for nonresidential developments, the district begins by calculating the total cost of CIP projects typically used by nonresident employees of the development (for example, greenways and natural trails) but excluding those not generally used by employees (for example, playgrounds and neighborhood parks). That dollar amount is divided by the projected number of new employees, yielding a "per new employee" rate: $86. Again, certain discounts and reimbursements are subtracted, resulting in a revised "per new employee" rate of $61. To convert that figure into a per-square-foot rate for new nonresidential development, the district uses guidelines from the Metro Employment Density Study specifying typical "square feet per employee" requirements in specific types of development (for example, distribution warehouses average 2,500 square feet per employee and storage warehouses average 20,000 square feet per employee). Thus, a new 100,000-square-foot distribution warehouse would pay an SDC of $2,440: 100,000 square feet at 2,500 square feet per employee, or 40 employees, at $61 each.

Plaintiffs have the burden of demonstrating the invalidity of conditions imposed on their development. *See Art Piculell Group*, 142 Or App at 331. Plaintiffs do not suggest that the SDC is unrelated to the resolution's stated objective of providing parks and recreational facilities, nor do they provide any argument, analysis, or information indicating that the amount of the fees that the resolution imposes is,

as a matter of law, unreasonable or arbitrary. Such arguments would not be successful. A single family dwelling that lasts for 50 years, for example, would be assessed around $40 per year for parks and recreation.

The SDC methodology here meets the "reasonable relationship" standard. That being the case, it also meets, *a fortiori*, the Due Process "rational basis" test.

Affirmed.