HOME BUILDERS ASSOCIATION OF
METROPOLITAN PORTLAND,
an Oregon non-profit corporation;
Stone Castle Homes, Inc.,
an Oregon corporation;
and Matrix Development Corporation,
an Oregon corporation,
*Appellants,*

*v.*

CITY OF WEST LINN,
an Oregon municipal corporation,
*Respondent.*

CCV0207049; A123168

131 P3d 805

Edward H. Trompke argued the cause for appellants. With him on the opening brief were E. Andrew Jordan and Jordan Schrader PC. On the reply brief was E. Andrew Jordan.

Peggy Hennessy argued the cause for respondent. With her on the brief was Reeves, Kahn & Hennessy.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ROSENBLUM, J.

## ROSENBLUM, J.

Petitioners in this writ of review action are developers and a developers' association. They initiated this action after respondent, the City of West Linn, adopted a resolution that increased the system development charge (SDC) that the city imposes on new development to pay for parks and recreation facilities. Petitioners asserted, among other things, that the SDC does not conform to statutory and other legal requirements and is not supported by substantial evidence. The trial court ultimately rejected petitioners' challenges. On appeal, petitioners renew a number of their challenges in six assignments of error. We affirm.

Before we recite the pertinent facts of this case, a brief explanation of some of the legal principles at issue is helpful. A system development charge is a one-time fee imposed by a governmental unit in response to the increased burden on public facilities created by new development. Oregon law authorizes governmental units to pass resolutions imposing SDCs to offset the cost of providing, among other things, parks and recreation facilities. ORS 223.297 - 223.314.[1] SDCs may take one (or both) of two forms, depending on the capacity of existing facilities to satisfy present and future needs. If, for example, a local government concludes, as a matter of policy, that its parks and recreation system is more than adequate to meet the needs of the existing population—in other words, the system has excess capacity—the government may charge new residents a "reimbursement fee," which essentially allows new users to buy into the existing system. ORS 223.299(3).

If, on the other hand, the local government concludes that the system is adequate only to meet the needs of the existing population—that is, it has no excess capacity—the government may charge new residents an "improvement fee," essentially requiring new users to pay for increasing the capacity of the system to accommodate the new users. ORS 223.299(2). Improvement fees, in other words, are intended to stop the addition of new users from diluting the level of service enjoyed by the existing population. However,

[1] We set out the text of the pertinent statutes below.

improvement fees must be calculated so that new users bear only the burden of maintaining that level of service—that is, the costs attributable to development; they may not be calculated or used to increase the level of service for the existing population. ORS 223.304(2)(a).

Turning to the facts of this case, we review the record that was before the West Linn City Council, the body whose decision is the subject of this writ of review. *Constant Velocity Corp. v. City of Aurora*, 136 Or App 81, 85, 901 P2d 258 (1995). The material facts are largely procedural and, except as noted, are not in dispute. The City of West Linn has imposed a parks and recreation SDC since 1991. The city evaluates the level of service of its system in terms of the number of acres of parks and "open space" per 1,000 residents. It has determined, as a matter of policy, that its parks and recreation system offers an acceptable level of service if it has between 10.39 and 13.7 acres of park space and between 4 and 6 acres of open space per 1,000 residents.

In 2000, the city reevaluated its system to determine its adequacy with respect to projected population growth. It concluded that its current inventory of parks and open space had no excess capacity to accommodate growth. It also determined that, by the year 2015, the population would have grown from 22,835 to 31,626, an increase of 8,791 people. Pursuant to ORS 223.309, the city developed a capital improvement plan (CIP), a list of projects intended to increase the capacity of the system. Based on the CIP, the city determined that maintaining the level of service would require purchasing and developing 49.29 acres of park space and 43 acres of open space—a total of 92.29 acres—at a cost of $1,540 for each new resident. The city therefore passed a resolution that required developers to pay an improvement fee SDC of $4,082 for each new single-family dwelling built and $2,886 for each unit in a new multi-family dwelling.[2]

In 2002, after reviewing the work of consultants and extensive written and oral testimony from members of the public, including petitioners, the city revised the CIP and

---

[2] The SDC was based on the assumption that each single-family dwelling and multi-family unit houses an average of 2.65 and 1.87 persons, respectively.

adopted a new resolution that increased the amount of the SDC. According to the city, the resolution increased the SDC to account for (1) an increase in the city's projected population growth, (2) increases in the projected costs of various projects included on the 2000 CIP, and (3) costs that had not been included on the 2000 CIP because they were not known at the time. When the resolution was adopted, West Linn's population had grown to 23,380 and was projected to reach 31,723 by 2015—97 more people than the earlier projection, but an increase of 8,343 people over the 2002 population. The 2002 CIP called for the acquisition of 86.07 acres of parks and 43.0 acres of open space.[3] The resulting improvement fee SDC was $8,228 per single family dwelling and $5,817 per unit in multi-family dwellings.

In response to the increased SDC, petitioners initiated this writ of review action on July 1, 2002.[4] Before the trial court, petitioners raised a number of objections to the substantive and procedural legality of the new SDC, some of which are pertinent to this appeal; we describe petitioners' arguments in detail below. For the moment, it suffices to say that the trial court rejected all of petitioners' objections except for one: petitioners asserted that the city is authorized to charge an SDC to pay for parks and recreation space, but not necessarily "open space." The trial court could not discern from the record whether some or all of the open space that the city proposed to fund with the SDC qualified as parks or recreation space. It therefore entered a judgment remanding the case and directing the city to make findings determining whether all of the open spaces that it considered in calculating the SDC were assets or facilities used for parks and recreation. The judgment stated that the court would retain

---

[3] The city's determination in 2000 that adding 92.29 acres would maintain the existing level of service was, in fact, incorrect. Based on the anticipated population increase of 8,791 people, the projects on the 2000 CIP would have added a total of only 10.49 acres of parks and open space per 1,000 new residents. Consequently, the city added new projects to the 2002 CIP. As we explain below, the projects on the current CIP will provide a total of 14.23 acres of parks and open space per 1,000 new residents.

[4] *Former* ORS 223.304(6) (2001), *renumbered as* ORS 223.304(7)(b) (2003), provided that a "person shall request judicial review of the methodology used for calculating a system development charge only as provided in ORS 34.010 to 34.100," the statutes governing writ of review proceedings.

jurisdiction over the matter to determine the legality of any modifications made by the city.

On remand, the city found that some, but not all, of the open space in its inventory qualified as parks or recreation space; it eliminated 22.8 acres that had previously been included. The adjustment meant that the level of service was lower than had previously been calculated, so the city concluded that, to maintain the level of service, it did not need to acquire as much open space as the 2002 CIP called for. Accordingly, it revised the CIP, reducing the open space figure from 43 acres to 32.6. On March 3, 2004, the city adopted a new resolution reducing the SDC by $199 for single family dwellings and $140 per unit for multi-family dwellings.

The trial court entered a supplemental judgment affirming the new resolution. Petitioners appeal from both the original, final judgment and the supplemental judgment.

■ In their first assignment of error, petitioners make two primary arguments. First, they assert that the trial court erred by remanding the case to the city, arguing that the trial court lacked statutory authority to do so. Second, they contend that the city lacked authority to modify its resolution on remand. We begin with the first argument. Petitioners contend that, in remanding the case to the city, the trial court erroneously relied on ORS 34.100, which describes the authority of a trial court in a writ of review action. That statute provides:

> "Upon the review, the court shall have power to affirm, modify, reverse or annul the decision or determination reviewed, and if necessary, to award restitution to the plaintiff, *or to direct the inferior court, officer, or tribunal to proceed in the matter reviewed according to its decision.* From the judgment of the circuit court on review, an appeal may be taken in like manner and with like effect as from a judgment of a circuit court in an action."

(Emphasis added.) Petitioners argue that the emphasized phrase does not authorize a remand but, rather, an affirmance. Petitioners interpret the word "its" in the statute to refer to "the inferior court, officer or tribunal," and argue that the emphasized language therefore authorizes the reviewing court to direct an inferior court, officer, or tribunal to proceed

according to "its" decision—that is, the decision of the inferior court, officer, or tribunal. Both the Supreme Court and this court have previously concluded, without explanation or analysis, that the trial court does have the authority to remand. *See Alt v. City of Salem*, 306 Or 80, 84, 756 P2d 637 (1988) (trial court has authority to remand under ORS 34.100); *Lyford v. Bd. of Comm'rs for Benton County*, 59 Or App 585, 591, 651 P2d 1355 (1982), *rev den*, 294 Or 460 (1983) (same); *Bayer v. Goldschmidt*, 17 Or App 334, 340, 521 P2d 1084 (1974) (interpreting the word "its" in ORS 34.100 to mean "the court's"). Those cases did not engage in the statutory interpretation analysis prescribed by *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), or, indeed, in any analysis at all. We do so now.

To determine the legislature's intent, we look to the text of the statute in context and, if necessary, to legislative history and other interpretive aids. *Id.* at 610-12. In examining the text in context, we consider rules of construction that bear directly on how to read the text, *id.* at 610-11, including "common grammatical rules," *State v. Webb*, 324 Or 380, 389, 927 P2d 79 (1996). Another rule is found in ORS 174.010, which directs that, "where there are several provisions or particulars[,] such construction is, if possible, to be adopted as will give effect to all." *See Carlson v. Myers*, 327 Or 213, 232-33, 959 P2d 31 (1998) (noting that the rule in ORS 174.010 applies at the first level of the *PGE* analysis).

Applying that framework, we reject petitioners' argument that the word "its" unambiguously refers to "the inferior court, officer or tribunal." According to petitioners, "its" must refer to "the inferior court, officer, or tribunal" because that is the nearest antecedent noun. Although petitioners are correct that, according to common grammatical rules, one way to resolve an ambiguous pronoun is to conclude that the pronoun refers to the nearest antecedent noun, an equally valid resolution is to conclude that it (again, the pronoun) refers to the most prominent noun in the sentence: the subject. *See Landswick v. Lane*, 49 Or 408, 412, 90 P 490 (1907) (discussing how "the law of prominence" and "the law of proximity" can each be used to resolve pronoun ambiguity). In this case, "the lower court officer or tribunal" is the nearest antecedent noun to the ambiguous pronoun at issue, but the

subject of and most prominent noun in ORS 34.100 is "the court." In short, the rules of prominence and proximity yield equally plausible results. Petitioners offer no reason to believe that the law of proximity is preferable in this instance, and we can discern no reason. It follows that that "common grammatical rule" does not indicate that our previous interpretation of ORS 34.100 was plainly wrong. At most, it indicates that the statute is ambiguous.

The rule of construction in ORS 174.010—that we must give effect, if possible, to all provisions in a statute—both resolves that ambiguity and confirms that our previous interpretation was, in fact, correct. As noted, petitioners argue that the provision in ORS 34.100 authorizing a reviewing court to direct an inferior court, officer, or tribunal to proceed according to "its" decision means, essentially, that the reviewing court may affirm the inferior body's decision. But affirmance is expressly authorized in the first clause of the statute. If petitioners' interpretation were correct, the statute would be redundant. *See State v. Young*, 196 Or App 708, 713, 103 P3d 1180 (2004), *rev den*, 338 Or 583 (2005) ("Well-worn principles of statutory construction counsel us to avoid, if possible, interpretations that render portions of a statute redundant."). In contrast, our earlier interpretation—that the statute authorizes the reviewing court to direct the inferior body to proceed according to the reviewing court's decision—would give separate effect to all provisions in the statute. We therefore adhere to that construction and hold that ORS 34.100 authorizes a reviewing court to remand to an inferior court, officer, or tribunal and direct the inferior body to proceed according to the reviewing court's decision. It follows that the trial court did not err in remanding this matter to the city.

■    We turn to petitioners' second argument. They argue that the city lacked authority to modify its resolution on remand because petitioners had already filed a notice of appeal. According to petitioners, ORS 19.270 (2003)[5] barred the city from proceeding on remand after a notice of appeal

---

[5] ORS 19.270 was amended by Oregon Laws 2005, chapter 568, section 25c. Both judgments in this case were entered before the effective date of the 2005 amendment, so the amendment does not affect our decision.

had been filed because that statute vested exclusive jurisdiction over the case in this court.

We disagree. ORS 19.270 had no bearing on the city's ability to proceed according to the trial court's decision. That statute governs the effect that filing a notice of appeal has on the jurisdiction of the trial court and the appellate courts. The ability of a party to proceed according to the trial court's decision after a notice of appeal has been filed is governed by ORS 19.330, which provides, "The filing of a notice of appeal does not automatically stay the judgment that is the subject of the appeal. A party may seek to stay a judgment in the manner provided by ORS 19.335, 19.340, or 19.350, or as provided by other law." Petitioners did not seek to stay the trial court's judgment in this case. Thus, the city was not barred from proceeding according to that judgment. We reject petitioners' first assignment of error.

■ In their second and third assignments of error, petitioners assert that the trial court erred in concluding that the city's SDC methodology complies with various legal requirements. Because their arguments are related, we consider them together. In the second assignment, petitioners contend that, when the city determined its future needs, it violated the SDC statutes by failing to include in its inventory parks not owned by the city but available to West Linn residents. In the third assignment, petitioners assert that the city was required by its comprehensive plan to include those parks in its inventory.

As petitioners note, the city's parks SDC is the result of a formula that determines the need for park land based on a desired level of service—the "adopted LOS." When it develops a capital improvement plan and establishes an SDC, the city determines how much land it will need to meet the adopted LOS based on population projections. If the amount needed to meet the adopted LOS exceeds the amount of land currently in the inventory—the "existing LOS"—the city must acquire more park land and may charge an improvement fee to SDC to pay for it. If, on the other hand, the existing LOS exceeds the amount needed to meet the adopted LOS, the city has excess capacity and need not acquire any additional land; therefore, no improvement fee is justified.

Petitioners contend that, when the city calculated its existing LOS in 2002, it failed to count in its inventory, among other lands, the 128 acres in Mary S. Young State Park, even though the park is available for use by West Linn residents, and even though the city's comprehensive plan stated in 2000 that the existing LOS included the park. According to petitioners, if the city had included the park in its inventory, it would have seen that it had an existing level of service of more than 22 acres per 1,000 residents—more than enough to accommodate the needs of future West Linn residents, given that the city's adopted LOS is 10.39 to 13.7 acres of parks per 1,000 residents. Thus, petitioners argue, the city should not have imposed an SDC to buy more park space.

The city responds that it took Mary S. Young State Park and other area facilities into account both when it determined its existing LOS in 2002 and when it made its adopted LOS policy determination. The city also argues that nothing in the SDC statutes or in the comprehensive plan requires the city to express the existing LOS for SDC purposes in the same way that it was expressed in the comprehensive plan.

We agree with the city. When it established its adopted LOS, it determined that the level of service that actually existed at the time was adequate to meet the needs of current West Linn residents but that it had no excess capacity to accommodate population growth. The city decided, as a matter of policy, that it would maintain that level of service. In other words, the existing LOS at that time became the minimum adopted LOS. In deciding how to measure the LOS for purposes of determining future needs, the city concluded that, for various policy reasons, it would inventory only city-owned parks. The city recognized that that measurement would result in an LOS that appeared to be low relative to national standards and other nearby jurisdictions.[6] It concluded that the seemingly low level was acceptable given that West Linn residents actually had access to other, non-city-owned parks.

_____

[6] The city noted that its LOS was lower than "National Standards, which suggest an LOS of 15.0 per 1,000" and considerably lower than nearby Portland's 18.0 per 1,000 population.

ORS 223.304(2)(a) (2001) provided that improvement fees shall:

"(A)   Be established or modified by ordinance or resolution setting forth a methodology that considers the cost of projected capital improvements needed to increase the capacity of the systems to which the fee is related.

"(B)   Be calculated to obtain the cost of capital improvements for the projected need for available system capacity for future users."[7]

Although the statute requires a city to establish its fees by use of a "methodology," nothing in the statute requires it to use any particular formula. Similarly, and contrary to petitioners' argument, nothing in the comprehensive plan requires the city to use any particular formula in calculating its projected need. Thus, the city was not precluded from adopting the actual level of service that existed at the time the decision was made as its "adopted LOS." Nor was the city precluded from measuring the adopted LOS as the inventoried city-owned parks *plus* other area facilities not formally included in the inventory; that is what the city effectively did. As long as the city measures the existing LOS in the same way when it determines its current or future needs, its methodology does not violate ORS 223.304(2).[8]

---

[7] The 2003 Legislative Assembly amended ORS 223.304(2). Or Laws 2003, ch 765, § 4a. The current version provides that improvement fees must:

"(a)  Be established or modified by ordinance or resolution setting forth a methodology that is available for public inspection and demonstrates consideration of:

"(A)  The projected cost of the capital improvements identified in the plan and list adopted pursuant to ORS 223.309 that are needed to increase the capacity of the systems to which the fee is related; and

"(B)  The need for increased capacity in the system to which the fee is related that will be required to serve the demands placed on the system by future users.

"(b)  Be calculated to obtain the cost of capital improvements for the projected need for available system capacity for future users."

The current version of the statute became effective after the city adopted the 2002 SDC but before it adopted the 2004 resolution modifying the CIP and SDC. The parties do not suggest that the differences between the two versions of the statute are material to our decision.

[8] Petitioners note that, in 2003, the city entered into an agreement to lease Mary S. Young State Park from the state. They contend that, because the city now controls the park, it should be treated as a city-owned park and therefore be

Petitioners fail to recognize that the city's adopted LOS is the LOS that actually existed at the time of adoption—regardless of the measurement method that the city chose to use. The parks that existed and were available to West Linn residents included Mary S. Young State Park and other facilities in the area. There can be no doubt that the city intended to maintain that LOS: It determined that, *even with the existence of Mary S. Young State Park and other nearby non-city-owned facilities*, it could not accommodate any future population growth without adding more park space.

Petitioners' position also ignores a simple reality: Given that the city did not include Mary S. Young State Park and other non-city-owned parks in its inventory when it established its adopted LOS, if it included them in the inventory now in order to determine its future needs, the *actual* level of service would deteriorate substantially as the population increases. Many more residents would compete to use the same amount of space. ORS 223.304(2) authorizes the city to impose SDCs to prevent that from happening.

Petitioners contend that there is no substantial evidence in the record showing that the city had already taken Mary S. Young State Park into consideration when it determined its need for additional parks. We disagree. "In a writ of review proceeding, substantial evidence in the record exists to support a finding when the record, viewed as a whole, would permit a reasonable person to make that finding." *Associated Builders and Contractors v. Tri-Met*, 170 Or App 271, 285, 12 P3d 62 (2000). The city's parks director, Ken Worcester, stated that the city set a relatively low adopted LOS because it took into account the fact that other parks in the area are available for West Linn residents to use. His statement constitutes substantial evidence.

---

included in the formal inventory. The city responds, in part, that the 2003 agreement is not within the scope of our review because it was neither part of the original record brought to the trial court nor within the scope of that court's remand order. We agree. Like the trial court, we are limited to reviewing the record created before the "inferior court, officer, or tribunal"—in this case, the city; the reviewing courts cannot take new evidence. *See Alt v. City of Salem*, 306 Or 80, 84-85, 756 P2d 637 (1988) ("The only possible justification for the continued existence of writs of review is that the procedure is fast and simple. Allowing evidence outside the record would change the nature of the proceeding and expand the scope of a writ of review beyond the statutory authorization.").

In short, the trial court correctly concluded that the city properly considered Mary S. Young State Park and other area facilities when it determined how much additional land would be needed in order to provide the adopted LOS as the population grows. We reject petitioners' second and third assignments of error.

■      In their fourth assignment of error, petitioners challenge the trial court's conclusion that the amount of the SDC is supported by substantial evidence. They raise several arguments in that regard, each of which we address in turn. Petitioners first contend that the city's 2002 SDC methodology (1) showed that the city anticipated only 97 more residents than it had anticipated in its 2000 methodology, but (2) provided for 129.07 additional acres of parks and open space land. According to petitioners, those numbers result in a ratio of more than one acre of new land for each additional resident. The city responds that the 2002 CIP did not provide for 129.07 acres of *additional* land—when compared with the 2000 CIP—because it included many projects that were also part of the previous CIP. Furthermore, the city contends, the new park land will not serve a mere 97 new residents, but will serve 8,343 people—all of the new residents anticipated to move to West Linn between 2002 and 2015.

We agree with the city. Petitioners argue from a faulty premise because they misapprehend the material facts underlying the city's 2002 CIP and SDC. The 2002 CIP was not developed merely to address the increase of 97 people over the present population estimates; nor did the city conclude that it needed 129.07 acres in addition to the projects planned in the 2000 CIP. The city concluded that, to serve the needs of the 8,343 new residents expected to move to West Linn after 2002, it needed 129.07 acres of new parks and open space in addition to its *existing* inventory.

Those determinations are supported by substantial evidence. As noted, the city has determined that its parks and recreation system offers an acceptable level of service if it has between 10.39 acres and 13.7 acres of city-owned park space and between four and six acres of open space per 1,000 residents. In 2002, the city's existing inventory included

10.85 acres of city-owned parks and 5.14 acres of open space per 1,000 residents. The city thus concluded that the needs of its current residents were being met but that it had no excess capacity. In other words, it determined that any increase in West Linn's population would create a need to expand the capacity of the system. The city determined that, by the end of the planning period—in 2015—the population will have increased by 8,343 people.

To meet the anticipated need, the city developed a CIP that called for adding 86.07 acres of new parks and 43 acres of open space—129.07 acres total. (After the trial court remanded the matter to the city, the city revised the open space figure to 32.6 acres.) Put another way, for every thousand new residents, the city will add 10.32 acres of parks and 3.91 acres of open space. Those additions will result in a parks and recreation system with 10.61 acres of parks and 4.10 acres of open space per 1,000 residents in 2015. Thus, the new CIP will maintain an acceptable level of service, albeit at a slightly lower level than that enjoyed in 2002.

Petitioners next argue that the city's determination of its future needs is not supported by substantial evidence because the city failed to account for lands that will become part of the parks inventory by other means. First, petitioners contend that the city failed to consider future dedications and exactions that will provide land to the city. According to petitioners, if the city accounted for such acquisitions, the total need on which the SDC is based would be lower. The city responds that developers are eligible to receive SDC credits for such dedications, meaning that the amount of SDC funds collected by the city would be reduced. Accordingly, the city asserts, it would have fewer funds with which to acquire additional park land. It argues that the amount of land needed would therefore not be overstated.

Again, we agree with the city. ORS 223.304(3) provides that an SDC ordinance or resolution "that establishes or modifies an improvement fee shall also provide for a credit against such fee for the construction of a qualified public

improvement."[9] Under that statute, a developer may dedicate land for parks or open space in lieu of paying the SDC, the funds from which the city would have used to purchase such land. A reduction in the amount of SDC funds received necessarily means that there will be a corresponding reduction in the amount of land that the city can acquire. Thus, because the city must provide SDC credits for dedications and exactions, those acquisitions will not increase the total amount of land that the city will ultimately acquire for parks and recreation. Accordingly, such acquisitions do not reduce the total need.

Petitioners also contend that the city failed to account for "donations" of land to the city and for "many fees and taxes," such as park and recreation user fees, which, according to petitioners, are an "important source of revenue" and should reduce the SDC. There is no evidence in the record that the city can anticipate donations. Furthermore, petitioners cite no authority for the proposition that user fees or any other "fees and taxes" must be applied to the acquisition and development of capital improvements needed to increase the capacity of parks and recreation systems to accommodate new users, and we are aware of no such authority. To the contrary, the statutes governing SDCs, ORS 223.297 to 223.314, authorize a governmental unit to fund such improvements exclusively through SDCs.

Petitioners next argue that the city overestimated the amount of park space that it needs because it intends to acquire residential lands for parks. According to petitioners, because there will be less residential land available, the population will not grow as much as the city anticipated, and, therefore, less park space will be needed to maintain the level

---

[9] *Former* ORS 223.304(3) (2001), *renumbered as* ORS 223.304(4) (2003), defined "qualified public improvement" as

"a capital improvement that is required as a condition of development approval, identified in the plan adopted pursuant to ORS 223.309 and either:

"(a) Not located on or contiguous to property that is the subject of development approval; or

"(b) Located in whole or in part on or contiguous to property that is the subject of development approval and required to be built larger or with greater capacity than is necessary for the particular development project to which the improvement fee is related."

of service. The city responds that SDCs are imposed as development occurs. If population growth is limited because some of the inventory of residential land is converted to parks, the city argues, there will be a corresponding reduction in the total amount of SDC funds received. Thus, according to the city, it will not acquire more park space than is needed. Petitioners reply that, even if park development is reduced, builders will already have paid artificially high SDC rates.

Again, petitioners' argument betrays a misapprehension of how an SDC is calculated. An improvement fee SDC for parks and recreation is based on the amount of land that must be acquired and developed in order to provide *each new resident* with the same level of service enjoyed by existing residents. The rate charged is the same whether the city ultimately adds one thousand new residents or one million. If population growth is artificially limited because the city reduces the amount of buildable land available, then the amount of park space will be commensurately limited: If the population grows by only half as much as the city anticipated, then the total amount of SDC funds available to the city will be reduced by half and, consequently, the amount of parks and open space added to the system will also be reduced by half. It may ultimately come to be that the city will not need as much new park space as anticipated in developing the 2002 CIP and calculating the SDC. But new residents will not have paid "artificially high rates." They will have paid the amount necessary to expand the system to provide for their needs.

Viewing the whole record, a reasonable person could conclude that the 2002 SDC was justified. It follows that the SDC is supported by substantial evidence. We reject the fourth assignment of error.

■ In their fifth assignment of error, petitioners assert that the trial court erred in allowing the city to charge SDCs for acquisition of open space. Petitioners do not contend that SDC funds can never be used to acquire open space. They concede that open space that serves a park or recreation function can be included in an SDC. They note, however, that some land defined as open space in the city's charter and comprehensive plan does not qualify as park or recreation

land.[10] They contend that the city did not create any record that showed that all nonqualifying open space had been removed from the city's inventory for purposes of determining the existing level of service. Accordingly, petitioners argue, there is no way to calculate what the SDC should be.[11]

We disagree with petitioners' assertion that the city failed to create a record showing that nonqualifying open space had been removed from the inventory. Ken Worcester, the city's parks director, submitted an affidavit in which he stated that the city had "reevaluated all open space previously included in its Parks Assets and Facilities calculations and determined that approximately 22.8 acres should be excluded." He explained that the city concluded that it had to remove those lands because they were "not generally available to the public as a park or recreation asset or facility." Based on Worcester's affidavit, a reasonable person could conclude that the remaining lands *are* available as park or recreation assets or facilities. It follows that Worcester's affidavit constitutes substantial evidence. Because it supports the conclusion that the city properly calculated the SDC, the trial court did not err.

■    In their sixth and final assignment of error, petitioners contend that the SDC effects a taking in violation of Article I, section 18, and Article XI, section 4, of the Oregon Constitution as well as the Fifth Amendment to the United States Constitution. Petitioners concede that this court has rejected the same arguments in earlier cases, *see Homebuilders Assn. v. Tualatin Hills Park & Rec.*, 185 Or App 729, 735, 62 P3d 404 (2003); *Rogers Machinery, Inc. v.*

---

[10] As petitioners note, section 46(c) of the city charter defines "open space" to include city-owned real estate identified as "green space," "wetland," "drainageway," "wildlife habitat," and "stream corridor." The comprehensive plan defines the term to encompass "parks, forests, and farm land," as well as "playgrounds [and] watershed preserves."

[11] Petitioners also appear to argue that, because the city charter and comprehensive plan define open space to include more than land used for parks and recreation, there is no assurance that SDC funds will not be used to acquire open space that does not qualify. If that is in fact petitioners' position, it does not present a justiciable controversy. Until the city determines what land it will acquire as open space, there is no reason to believe that it will spend SDC funds inappropriately, and, thus, there is no justiciable controversy. *See* ORS 223.302(2) (providing for administrative and judicial review of expenditures of SDC funds).

*Washington County*, 181 Or App 369, 400, 45 P3d 966, *rev den*, 334 Or 492 (2002), *cert den*, 538 US 906 (2003), but they urge us to reconsider and overrule those decisions. We are not persuaded that our decisions were incorrect and therefore decline to overrule them.

Affirmed.