Argued and submitted October 13, 2010, reversed and remanded September 8, 2011, petition for review denied February 2, 2012 (351 Or 545)

RIVER'S EDGE INVESTMENTS, LLC,
*Plaintiff-Respondent,*

*v.*

CITY OF BEND,
a municipal corporation,
*Defendant-Appellant.*

Deschutes County Circuit Court
07CV0557MA; A141661

265 P3d 786

Robert E. Franz, Jr., argued the cause for appellant. With him on the opening brief was Law Office of Robert E. Franz, Jr. On the reply brief were Hannah Meisen-Vehrs and Law Office of Robert E. Franz, Jr.

Robert E.L. Bonaparte argued the cause for respondent. With him on the brief were Arden E. Shenker and Shenker & Bonaparte, LLP.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

SERCOMBE, J.

.

**SERCOMBE, J.**

Defendant City of Bend appeals from a limited judgment that granted partial summary judgment and awarded $142,190 to plaintiff River's Edge Investments, LLC (River's Edge). The resolution of this case depends on whether the terms of a development agreement between the city and River's Edge allowed the city to impose system development charges (SDCs) on River's Edge for its construction of a convention facility. River's Edge contends that the agreement precluded such charges absent a triggering event that did not occur in this case. The city asserts that the agreement expressly allowed it to charge the SDCs. After cross-motions for summary judgment, the trial court concluded that the agreement unambiguously precluded the city from assessing the SDCs at issue. The city appeals, assigning error to the trial court's grant of partial summary judgment to River's Edge and its denial of the city's motion for partial summary judgment. Alternatively, the city maintains that the development agreement is ambiguous and the case should be remanded to the trial court for the consideration of extrinsic evidence of the parties' intent. We conclude that the development agreement unambiguously authorizes the SDCs charged by the city and reverse and remand.

The underlying controversy between the parties involves River's Edge's planned unit development (PUD). River's Edge began developing the PUD in the early 1980s. The parties entered into the development agreement at issue in 2004; by that point, a portion of the PUD had been developed to include a hotel, golf course, and residences. By 2004, the development plan was revised on several occasions and those revisions required the city's approval. The revision and approval process led to disputes and litigation between the parties.

In an effort to resolve then-pending litigation and other issues related to River's Edge's planned construction of a convention facility in the PUD, the parties negotiated the development agreement at issue in this case. As required by statute, the city adopted an ordinance approving the development agreement. *See* ORS 94.508(2) (stating that the governing body must "approve a development agreement * * * by

adoption of an ordinance declaring approval"). Ordinance NS-1951 included over 160 pages of findings and conclusions related to the PUD and the development agreement.

As to what happened next, the parties stipulated to the following facts for purposes of the parties' cross-motions for summary judgment. River's Edge constructed a convention facility within the scope of the development agreement. As a result, the city assessed SDCs in connection with that construction in the amount of $142,190. River's Edge, under protest, paid the SDCs. River's Edge filed suit against the city.

As pertinent to this appeal, River's Edge brought a claim alleging that the city had breached the development agreement by imposing the SDCs. River's Edge also sought a declaration under ORS chapter 28 that it is not subject to any exactions in connection with the PUD except as provided in the development agreement.[1] The parties filed cross-motions for summary judgment, and the trial court granted partial summary judgment to River's Edge and denied summary judgment to the city. Accordingly, the court entered judgment awarding damages in the amount of the SDCs paid— $142,190, plus interest. The city appealed.

We interpret contract provisions according to a three-step process. *Yogman v. Parrott*, 325 Or 358, 361-64, 937 P2d 1019 (1997). First, we examine the text of the disputed provisions in the context of the document as a whole. *Id.* at 361. In doing so, we determine as a matter of law whether the provision is ambiguous. If the words or terms of a contract, in context, are susceptible to more than one reasonable interpretation, they are ambiguous. *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 348, 876 P2d 761 (1994). Put another way, a contract is unambiguous "if its meaning is so clear as to preclude doubt by a reasonable person." *Deerfield Commodities v. Nerco, Inc.*, 72 Or App 305, 317, 696 P2d 1096, *rev den*, 299 Or 314 (1985). If a contract

---

[1] River's Edge also brought a claim for unjust enrichment and a takings claim under Article I, section 18, of the Oregon Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. Neither of those claims were determined by the limited judgment under review.

contains provisions that are mutually inconsistent, the contract is ambiguous as to that subject unless the inconsistent provisions can be reconciled in reading the contract as a whole. *Madson v. Oregon Conf. of Seventh-Day Adventists*, 209 Or App 380, 384, 149 P3d 217 (2006). If the provision is unambiguous, our analysis ends and we construe the words of the contract as a matter of law. If the provision is ambiguous, we proceed to the second step of the analysis—the examination of extrinsic evidence of the contracting parties' intent. *Yogman*, 325 Or at 363. If extrinsic evidence does not provide an answer, we proceed to the third step—reliance on appropriate maxims of construction. *Id.* at 364.

We begin with the provisions of the development agreement that are central to the parties' dispute. River's Edge contends that Section 7 eliminates its obligation to pay SDCs until the development agreement expires or it exceeds the "Maximum Density"[2] of the PUD as that term is defined in the agreement. The relevant portions of Section 7 state:

> "7.1  The City shall not require any additional off-site transportation mitigation measures or street exactions pursuant to Street Policy 6 or any other land use ordinance or policy, unless River's Edge applies for, and the City approves, modifications to the River's Edge Village 2004 PUD that would increase the total number of Peak Hour Trips beyond the total number of trips in the Maximum Density, in which case, the development that exceeds the Maximum Density may be subject to additional transportation-related exactions.
>
> "7.2  River's Edge shall provide additional mitigation for sewer-related impacts by granting the sewer easements to

_____

[2] The development agreement defines "Maximum Density" as

"an overall density in the River's Edge Village 2004 PUD that puts no greater burden on the City's infrastructure than the sum of (1) the existing development in the River's Edge Village PUD, (2) the development authorized by the 2004 Master Plan Amendments and (3) the Remaining Development at a stated density. It is expressed quantitatively as 585 sewer EDU credits, 585 water EDU credits, and 505 PM Peak Trips. By way of illustration, the 2004 PUD Master Plan Amendments allocate the Maximum Density to 27,058 square feet of meeting space, 10,300 square feet of restaurant, 101 condominiums, 388 residential units, and a spa and recreation center."

The parties agree that "EDU" is a typographical error and was intended to mean "ERU," the Equivalent Residential Units referenced in Section 7.2.

the City (Exhibits A-11, A-12 and A-19). The Sewer Ease-ments, together with prior dedications, satisfies River's Edge's obligation to provide sewer impact mitigation in con-nection with the Maximum Density, expressed as Equiva-lent Residential Units ('ERUs'). The City shall require no other sewer-related exactions as a condition of approval, unless River's Edge applies for, and the City approves, mod-ifications to the River's Edge Village 2004 PUD that would increase the total number of ERUs beyond the total number of ERUs in the Maximum Density, in which case, the devel-opment that exceeds the Maximum Density may be subject to additional sewer-related exactions.

"7.3   Water supply volume and pressure requirements to serve the River's Edge Village 2004 PUD have been satis-fied by dedication, and no further improvements or charges shall be assessed or exacted as a condition of approval, unless River's Edge applies for, and the City approves, mod-ifications to the River's Edge Village 2004 PUD that would increase the total number of ERUs beyond the total number of hookups in the Maximum Density, in which case, the development that exceeds the Maximum Density may be subject to additional water-related exactions.

"7.4   Other than as specified in this Agreement, there shall be no additional dedications for public use of land or rights-of-way taken as exactions in any City Permit or on account of any component of the Proposed Development. The City's commitment herein does not extend to exactions that might be required by Third Party governmental enti-ties * * *."

The city acknowledges that Section 7 waived some "exactions," but asserts that the SDCs charged in this case were not waived in Section 7. Instead, the city maintains that the SDCs were separately addressed and explicitly required by Section 11. Section 11 states:

"11.   Fees and Charges. River's Edge and the City shall each pay the filing fees and charges in effect at the time any land use or other applications are filed with the City. When building permit applications are filed for all or any portion of the Proposed Development, the applicant shall pay and the City shall collect the System Development Charges ('SDC') in effect at the time of each application."

(Underlining in original.) Thus, the question, as framed by the competing contract provisions, is whether the waiver of exactions in Section 7 exempts River's Edge from paying the SDCs that the city charged under Section 11.

The city, on appeal, contends that the exactions referenced in Section 7 relate only to

> "property and property rights previously transferred and to-be transferred to the City by [River's Edge] for location of the infrastructure necessary to provide water, sewer, and transportation services to [River's Edge's] developments."

The city explains that, when the parties entered into the development agreement, they agreed that River's Edge had "done all that was required to create a sufficient infrastructure, up to the Maximum Density, and no more exactions were required[,]" but, if the development exceeded the agreed upon Maximum Density, the plaintiff would become susceptible to exactions for that portion, as set out in Section 7. The city maintains that SDCs are not the type of exactions specified in Section 7 and that, "separate from the provisions addressing the infrastructure for [River's Edge's] development," the parties addressed River's Edge's obligation to pay SDCs in Section 11. Accordingly, the two provisions can be read in harmony—Section 7 excused River's Edge from contributing the specific types of exactions listed in that section unless Maximum Density was reached, but Section 11 explicitly required River's Edge to pay any applicable SDCs when River's Edge filed building permit applications. The city contends that the interpretation advanced by River's Edge would render Section 11 meaningless.

River's Edge's argument on appeal, reduced to its core, is that the development agreement was

> "intended to provide to the [c]ity all infrastructure exactions necessary to allow development of the River's Edge PUD to the 'Maximum Density,' and to prevent the City from requiring any more exactions, of any kind, related to development of the PUD to the Maximum Density."

Accordingly, River's Edge asserts that SDCs are exactions of the type waived in Section 7. River's Edge explains that the text in Section 11 simply established that, "when charges are

due, for building permits or other approvals, the amount of those fees and charges will be determined with reference to <u>then current</u> fees and methodologies, not the fees and methodologies in place in 2004, when the Agreement was executed." (Emphasis in original.)

Our analysis begins with the text of the competing provisions in the development agreement. As the city points out, Section 7 references very specific types of exactions—all of which appear to relate to a transfer of property interests or property improvements required as a condition of land use approvals. Section 7.1 addresses "off-site transportation mitigation measures or street exactions pursuant to Street Policy 6 or any other land use ordinance or policy." The first and second sentences of Section 7.2 address "mitigation for sewer-related impacts" in terms of sewer easements and prior dedications being granted to the city by River's Edge. The third sentence of Section 7.2 states that "no other sewer-related exactions" shall be required "as a condition of approval" unless the Maximum Density is exceeded, thus explicitly tying the waiver of sewer exactions to those already mentioned—easements and land dedications. Similarly, Section 7.3 refers to "[w]ater supply volume and pressure requirements" that have been satisfied by dedication, and "no further improvements or charges shall be assessed or exacted as a condition of approval." Again, like Sections 7.1 and 7.2, Section 7.3 appears to frame the type of exaction addressed as an easement or dedication. Easements and dedications both implicate the transfer of a property interest. *See Black's Law Dictionary* 473 (9th ed 2009) (defining dedication as "[t]he donation of land or creation of an easement for public use"). Section 7.4 summarizes that, "[o]ther than as specified in this Agreement, there shall be no additional dedications for public use of land or rights-of-way taken as exactions in any City Permit or on account of any component of the Proposed Development." Again, the text of Section 7.4 appears to link the use of the term "exactions" with the dedications and easements granted as part of the development agreement. Moreover, Section 7 precludes exactions that are imposed "pursuant to * * * land use ordinance or policy" or "as a condition of approval." Those references plainly pertain to land use permits or approvals.

Nevertheless, standing alone, the references to exactions in Section 7 could possibly be construed to include SDCs because SDCs have been classified as "exactions" for purposes of analyzing state and federal takings law. *See Rogers Machinery, Inc. v. Washington County*, 181 Or App 369, 394, 45 P3d 966, *rev den*, 334 Or 492 (2002). Our task, however, is not to look at contract provisions in isolation, but to consider them in the context of the agreement as a whole.

The text of Section 11 calls into question the plausibility of River's Edge's proffered interpretation. River's Edge contends that Section 11 is simply a timing provision that establishes that, if the provisions in Section 7 ever trigger additional exactions—*i.e.*, if the River's Edge development exceeds the Maximum Density—the amount of the fees and charges will be determined with reference to the then-current fee schedule, not the fee schedule in place in 2004. We fail to see how Section 11 can be read in that way. Although the first sentence of the provision plausibly dictates whether a current fee schedule or the fee schedule in 2004 controls, the second sentence does not appear capable of such a limited effect. The first sentence states that the parties "shall each pay the filing fees and charges in effect at the time any land use or other applications are filed with the City." The second sentence, however, states, "When building permit applications are filed for all or any portion of the Proposed Development, the applicant shall pay and the City shall collect the System Development Charges ('SDC') in effect at the time of each application." That text explicitly dictates *whether* the applicant pays SDCs ("the applicant shall pay") and *when* the applicant pays SDCs ("[w]hen building permit applications are filed").

Further, Section 11 requires the payment of SDCs imposed as part of "building permit applications." Building permits are governed by a code promulgated by a state agency, ORS 455.020, as opposed to land use ordinances, and are not "land use decisions," ORS 197.015(10)(b)(B) (so stating). They are not imposed as a "condition of [land use] approval." In addition, nothing in Section 11 explicitly limits SDCs to only those building permit applications filed after Maximum Density is reached. Similarly, there is no cross-reference to Section 7 that would link "exactions" referenced in Section 7 with the SDCs made payable in Section 11, and

"exaction" is not defined in the agreement. Accordingly, nothing explicitly links the SDCs referenced in Section 11 with the use of "exactions" in Section 7.

Therefore, the text of Sections 7 and 11, when read together, indicate that River's Edge is excused from any further real property interest exactions of the kind identified in Section 7, but they are explicitly required to pay any applicable SDCs when building permit applications are filed. River's Edge's proposed interpretation of Section 11 as a statement of "timing" is not plausible based on the specific text of the two sections.

Nevertheless, River's Edge cites several other provisions in the development agreement that it contends provides contextual support to its proffered reading of the development agreement. We address each in turn to determine if they call into question what appears to be the unambiguous text of Section 11.

First, River's Edge points to several paragraphs in the development agreement that it claims would be rendered nugatory if Section 11 is interpreted to require River's Edge to pay SDCs as a matter of course. For example, River's Edge claims that the agreement's recitals unequivocally recognize that the purpose of the development agreement is to "obtain assurances that the developer's infrastructure obligations have been fully discharged" and to give River's Edge the right to continue development "with no further exactions." River's Edge also cites text in the agreement that indicates that, even in areas of the PUD that are still under design and will remain undeveloped for the time being, the city has determined that "no further street, water, sewer and park trail exactions are due from River's Edge to the extent that the Maximum Density is not exceeded." Those provisions beg the question. Although they fortify the conclusion that certain exactions are waived in Section 7, they do not call into question the city's proffered interpretation—that the exactions referenced throughout the agreement are linked to the specific exactions described in Section 7 but do not include the SDCs due when building permit applications were filed.

The city offers an additional explanation for the different treatment of "exactions" and SDCs in the development agreement. The city asserts that a PUD is first subject to

approval through the land use permitting process—a process that may require certain exactions in the form of dedications and easements. A development agreement is often used to set expectations and obligations during the land use permitting process so that the parties are aware of the exactions and infrastructure needs required for approval during the initial process. In this case, the development agreement addressed those exactions and acknowledged that River's Edge had contributed sufficient property interests to the infrastructure to garner approval in the land use permitting process. However, after the PUD received approval in that process, River's Edge was required to submit building permit applications at the time of actual construction, thus triggering the SDCs. The development agreement recognizes that these are separate processes, in that Section 15 treats the building permit application process as a "future discretionary approval" and explains that the agreement is not intended to limit the city's discretion with regard to future building permit approvals. According to the city, the exactions referenced throughout the development agreement were concerned with the land use permitting process; the agreement separately dealt with SDCs related to the building permit applications in Section 11.

River's Edge also notes that "Maximum Density" is expressed quantitatively in terms of "Equivalent Residential Units" (ERUs), which is also a term used in calculating SDC credits under the city's ordinances. According to River's Edge, the use of ERUs in the definition of "Maximum Density" evinces an intent to grant it a number of SDC credits that must be taken into account when the city assesses SDCs under Section 11. In other words, SDCs are not assessable until Maximum Density is exceeded. Contrary to River's Edge's contention, the agreement does not contain explicit language establishing SDC credits. The definition of "Maximum Density" is simply a recognizable way of quantifying the concept of "Maximum Density" in the agreement. In light of the text of Section 11 and Section 7, the mere use of ERUs in the definition of "Maximum Density" does not convince us that those sections are inconsistent.

In summary, the first step of contract interpretation requires us to determine as a matter of law whether the disputed provisions of the contract are ambiguous. In this case,

the explicit text of Section 11 is open to only one plausible interpretation—SDCs are due and payable when building permit applications are filed. There are no other provisions in the contract that reasonably link the SDCs due under Section 11 with the exactions waived in Section 7, so as to make Section 7 mutually inconsistent with Section 11. Accordingly, we conclude that the development agreement unambiguously authorizes the SDCs charged by the city in this case.

Reversed and remanded.